Curtis MOORE, Appellant,

v.

STATE of Indiana, Appellee.

No. 185S10.

Supreme Court of Indiana.

Oct. 3, 1986.

Rick L. Jancha, South Bend, for appellant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Curtis Moore was convicted of Robbery, a class A felony, by a jury in the St. Joseph County Superior Court. He was sentenced to a term of forty-two (42) years and now appeals, raising the following errors:

1. admitting certain hearsay evidence;
2. admitting Appellant's confessions and admissions when the State had failed to establish the *corpus delicti;*

3. admitting statements which were not intelligently and voluntarily given; and
4. sufficiency of the evidence.

On May 12, 1983, Officer Terry Allen of the South Bend Police Department was dispatched to investigate an occurrence at Renoy Vrient's residence. When Officer Allen entered the home he found Vrient seriously injured and lying on the floor, discovered a window screen removed from a bathroom window, and realized an intruder had gained entrance through that window. Officers Allen and Shock dusted for fingerprints after getting aid for Vrient. On that same day, Appellant admitted to his cousin, Noah Rucker, with whom he lived, that he had broken into Vrient's home, assaulted him, and stole money and a truck. Shortly thereafter, Appellant fled to Milwaukee, Wisconsin. Rucker later discovered a RCA X–L 100 television set in Appellant's room. Rucker transported the television to the home of Ann Harris, Rucker's girlfriend.

Thereafter, Officer Vincent Laurita located the victim's truck and impounded it. During a search of the vehicle, Officer Laurita found a piece of paper with the name "Noah Rucker" written on it. On May 21, 1983, the victim died. The following day, Officer Raymond Sucik of the Milwaukee, Wisconsin, Police Department, arrested Appellant on suspicion of the murder committed in South Bend, Indiana. Officer Roosevelt Harrell of the Milwaukee Police Department, read Appellant the *Miranda* warning. At this time, Appellant acknowledged his understanding of his rights but refused to sign a waiver form. While Appellant admitted he had been in South Bend around the time the robbery occurred, he denied involvement in any offenses and refused to elaborate further.

Officers Laurita and Walton of the South Bend Police Department arrived in Milwaukee on May 27, 1983, to transport Appellant back to South Bend. Once again, the officers read the *Miranda* warning to Appellant. However, this time Appellant signed the waiver form and Officers Walton and Laurita took Appellant's first statement. During this interview, Appellant

was responsive, cooperative, and never requested the assistance of counsel. Appellant informed the officers that during the early morning hours of May 12, 1983, he and Noah Rucker, entered Vrient's home through a window. While Rucker and Vrient struggled, Appellant searched for and stole money and a television set. Appellant and Rucker then placed the television into Vrient's truck and fled.

After taking Appellant's statement, Laurita and Walton transported Appellant to South Bend. En route, Appellant informed Walton that he wanted to correct his earlier statement. Walton told Appellant an advisement of rights would be given and a second statement could be made in South Bend. The following day, May 28, 1983, Appellant was again advised of his rights, indicated his understanding, and signed a waiver form. He then proceeded to give a second statement in which he admitted to acting alone in the robbery. He stated he entered Vrient's residence by prying a screen from a window. Vrient, armed with a weapon, confronted Appellant. Appellant beat him and bound his hands and feet. Appellant then stole money, a television set, a .22 caliber weapon and truck.

After Appellant was arrested, Officer Lulu fingerprinted him. Clyde Ottinger, a fingerprint specialist employed by the FBI, compared Appellant's fingerprints with prints lifted from areas in the victim's home and determined they were from the same individual. Finally, through the use of serial numbers, it was determined that the television recovered from Harris' residence was purchased by the victim. At the conclusion of this evidence, the jury convicted Appellant of Robbery resulting in bodily injury.

I

■ Appellant alleges the trial court erred by allowing Officer Allen to testify as to what he observed on the victim's wallet upon discovering the victim. Officer Terry Allen of the South Bend Police Department testified that on May 12, 1983, he was assigned to an investigation at 2306 Longley Avenue in South Bend, at approximately 1:30 a.m. When he arrived he observed an individual lying on his back on the floor in the den. He was asked if he made an identification of the individual. Allen indicated that he found a wallet with a man's name on it. He was asked to give the name. The defense objected that such a question called for hearsay and that the best evidence would be the wallet. The trial court overruled the objection and allowed Allen to state the wallet contained the name Renoy Vrient.

Appellant's first contention, that Officer Allen's testimony was inadmissible hearsay, is unfounded. Hearsay evidence is in-court testimony about an extra-judicial statement offered to prove the truth of the matter asserted therein. Such evidence is objectionable when the value of the testimony rests on the credibility of the declarant and the declarant is not in court or is otherwise unavailable for cross-examination. *Grimes v. State* (1983) Ind., 450 N.E.2d 512, 522. We agree, however, with the State that the information in the wallet was not put into evidence to prove the truth of what the information stated but was put in to explain Allen's actions. Dr. Koscielski identified the victim when he testified he knew the victim and his name was Renoy Vrient. Allen's testimony gave continuity to Dr. Koscielski's testimony and explained Allen's observations and the actions he took afterwards. As such, Allen's testimony did not constitute hearsay. *Wagner v. State* (1985), Ind., 474 N.E.2d 476, 491. The testimony was proper and the trial court did not err in permitting Officer Allen to testify as to the name on the wallet.

■ Appellant next contends that Officer Allen should not have been permitted to testify as to what name was displayed on the wallet because of the best evidence rule. The best evidence rule, referred to by this Court as the original documents rule, applies to a document that is used to prove a material fact in the case. Where the document is not central to litigation, the original documents rule does not apply.

*Darnell v. State* (1982), Ind., 435 N.E.2d 250, 254. Here the name on the wallet was not central to the prosecution of Appellant. Moreover, Dr. Koscielski identified the victim and this identity was undisputed. Accordingly, Appellant was not prejudiced and the trial court did not err by allowing Officer Allen to testify as to the name on the wallet.

## II

Appellant claims there were several incidents of the trial court erroneously admitting testimony because the State failed to establish the requisite *corpus delicti*. The testimony consists of the following incidents. Appellant gave the police two statements confessing his involvement after his arrest which were admitted over his objection. Appellant also objected to Noah Rucker's testimony recounting admissions made by Appellant to him. Finally, Officer Walton, who transported Appellant from Milwaukee to South Bend, testified over Appellant's objection that en route Appellant stated he wanted to correct the first statement he gave the police. Walton advised Appellant he could do so when they arrived in South Bend. On appeal, Appellant argues the trial court erred by admitting these out of court statements without evidence of the *corpus delicti*, in other words, without sufficient evidence to prove that the crime charged had actually been committed.

The trial court, however, did not err in this respect as there was sufficient evidence, independent of Appellant's out of court statements, to establish the *corpus delicti*. To establish the *corpus delicti*, evidence independent of a defendant's statement must be presented which shows that a criminal act actually occurred. *Graham v. State* (1984), Ind., 464 N.E.2d 1, 7, *reh. denied.* In order for a confession to be admitted at trial, corroborating evidence of the *corpus delicti* must be introduced. *Hudson v. State* (1978), 268 Ind. 310, 313, 375 N.E.2d 195, 196. However, although it is preferable to first establish the *corpus delicti* before offering a confession or

statement against interest by a defendant, it is not necessary. The order of proof is within the sound discretion of the trial court. *Evans v. State* (1984), Ind., 460 N.E.2d 500, 502. Further, circumstantial evidence may establish the *corpus delicti* and it need not be proven beyond a reasonable doubt. *Graham, supra.* There was ample evidence presented in this case to prove the *corpus delicti*. Officer Allen arrived at Renoy Vrient's residence and discovered Vrient, lying bound and seriously injured on the floor in the den. A screen had been removed from the bathroom window, and the area appeared as if someone had entered through the window. Vrient's truck, television, and other items were missing. Later, Officer Laurita located Vrient's truck, and during a search of it found a piece of paper with "Noah Rucker" written on it. Meanwhile, Rucker, with whom Appellant resided, discovered a RCA XL 100 television set in Appellant's room after Appellant fled to Milwaukee. Through the use of serial numbers, it was shown that Vrient had purchased that television set. Further, Clyde Ottinger, a FBI fingerprint specialist, compared Appellant's fingerprints with those lifted from areas in the victim's home and determined the prints were made by the same individual. This was sufficient independent proof, apart from Appellant's statements, to establish that a robbery had been committed. The trial court, therefore, did not err by admitting testimony concerning Appellant's statements over Appellant's objections that the *corpus delicti* was not established.

## III

Appellant next alleges the court erroneously admitted the two statements he gave the police and his statement to Officer Walton concerning his wanting to correct his first statement. He claims these statements were admitted though the State failed to demonstrate they were intelligently and voluntarily given. Appellant asserts his statements were coerced, that they were involuntary because he had invoked his right to assistance of counsel, and that

he was re-interrogated after he had elected to remain silent.

It is well settled that the burden is on the State to prove beyond a reasonable doubt that a defendant voluntarily and intelligently waived his rights and that a confession was voluntarily given. Upon a review of the denial of a motion to suppress a confession and the subsequent admission of the confession into evidence, an appellate court will neither weigh the evidence nor judge the credibility of the witnesses. The admissibility of a confession ultimately depends upon questions of fact which are to be resolved by the trial court. *Bevill v. State* (1985), Ind., 472 N.E.2d 1247, 1250, *reh denied.* Further, the admissibility of a statement or confession is controlled by determining from the totality of circumstances whether or not a confession was given voluntarily and not through inducement, violence, threats, or other improper influences so as to overcome the will of an accused. *Massey v. State* (1985), Ind., 473 N.E.2d 146, 147. On appeal, a trial court's finding of voluntariness of a confession will not be disturbed if there is substantial, though conflicting evidence to support the ruling. *Jones v. State* (1984), Ind., 464 N.E.2d 1283, 1286. The evidence adduced at trial supporting the trial court's ruling that the statements in issue were knowingly and voluntarily given are as follows.

On May 26, 1983, Officer Sucik of the Milwaukee Police Department arrested Appellant on suspicion of a murder committed in South Bend. In order to complete an arrest, Officer Harrell read Appellant the *Miranda* warning. Although Appellant advised Officer Harrell that he understood his rights, he declined to sign a waiver of rights form. Appellant then proceeded to state he was in South Bend during the time frame in issue, but he denied involvement in any offenses and refused to elaborate further. On May 27, 1983, Officer Laurita and Walton of the South Bend Police Department arrived in Milwaukee to transport Appellant to South Bend. The officers read and explained the *Miranda* warning to Appellant, at which time Appellant signed the waiver form. Appellant then was cooperative, responsive to questions, and never requested the assistance of counsel. There also was evidence that Appellant was never threatened or coerced into signing the waiver or answering questions. After Appellant confessed to robbing Vrient, Officers Laurita and Walton transported him to South Bend. En route, Appellant requested that corrections be made to his first statement. Officer Walton told him he could correct his statement in South Bend. The following day, Appellant was advised of his rights, indicated he understood them, and signed a waiver form. Again, Appellant was willing to talk with Officer Walton and informed him that, contrary to his previous statement, he had perpetrated the robbery alone and not with Noah Rucker. This evidence is sufficient to support the trial court's findings that Appellant's waivers and statements were freely and voluntarily given.

■ Further, Appellant's contention that his confessions were involuntary since he was denied the opportunity to consult with an attorney is unfounded. Apart from Appellant's assertions, the record does not reveal that Appellant requested to speak with an attorney. To the contrary, there was testimony at trial that Appellant did not request assistance of counsel before making a statement. Further, a defendant's signed waiver indicates he was willing to make a statement and did not wish to have an attorney appointed for him. *Tyson v. State* (1979), 270 Ind. 458, 461, 386 N.E.2d 1185, 1188. Appellant's signed waivers and testimony that he did not request the assistance of counsel were sufficient evidence supporting the trial court's determination that Appellant's statements were voluntary.

Appellant also claims it was improper for the South Bend Police to question him when he had expressed his desire to remain silent on the issue to the Milwaukee Police.

■ We recognize that this issue was discussed recently in *Phillips v. State* (1986), Ind., 492 N.E.2d 10, which requires clarification. Although it was *dicta* in

*Phillips,* the implication was that one electing to remain silent triggers the same obligation on the part of police as a request for counsel. An analysis of these issues indicates such is not the case.

*Miranda* was handed down by the United States Supreme Court in 1966. Among its provisions was one that stated: "Once warnings have been given the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona,* 384 U.S. 436, 473, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966). The first time the United States Supreme Court had occasion to speak on this particular provision of *Miranda* was in 1975 in the case of *Michigan v. Mosley* (1975), 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313.

Mosley was arrested in Detroit, Michigan, in connection with robberies that had recently occurred at the Blue Goose Bar and the White Tower Restaurant. Detective James Cowie attempted to interrogate Mosley on these robberies but he stated he did not want to answer any questions about the robberies. Cowie promptly ceased the interrogation. The court noted that at no time during the questioning did Mosley indicate a desire to consult with a lawyer. Later that same day, Detective Hill of the Detroit police brought Mosley from the cell block to a fifth floor office and questioned him about the fatal shooting of a man named Leroy Williams, who had been killed during a robbery attempt outside the 101 Ranch Bar in Detroit. Mosley had not been arrested on this charge or interrogated about it by Detective Cowie. Hill carefully advised Mosley of his *Miranda* rights before the questioning. Mosley finally confessed to participating in this robbery and slaying to Detective Hill. At no time during this second interrogation did Mosley ask to consult with a lawyer or indicate he did not want to discuss the homicide. Mosley's motion to suppress the confession was denied by the trial court. On appeal, the Michigan Court of Appeals reversed Mosley's conviction, holding that Detective Hill's second interrogation of Mosley was a *per se* violation of the *Miranda* doctrine. Further appeal was denied by the Michigan Supreme Court. The United States Supreme Court granted a Writ of Certiorari " ... because of the important constitutional question presented." *Michigan v. Mosley,* 419 U.S. 1119, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975).

Even though Mosley was questioned the second time by a different police officer about a different robbery the Supreme Court nonetheless discussed the application of the *Miranda* safeguards where one is interrogated after he has invoked his right to remain silent. In discussing the provision of *Miranda* stated above, the Supreme Court in *Mosley* stated:

"This passage states that the 'interrogation must cease' when the person in custody indicates that 'he wishes to remain silent.' It does not state under what circumstances, if any, a resumption of questioning is permissible. The passage could be literally read to mean that person who has invoked his 'right to silence' can never again be subjected to custodial interrogation by any police officer at any time or place on any subject. Another possible construction of the passage would characterize 'any statement taken after the person invokes his privilege' as 'the product of compulsion' and would therefore mandate its exclusion from evidence, even if it were volunteered by the person in custody without any further interrogation whatever. Or the passage could be interpreted to require only the immediate cessation of questioning, and to permit a resumption of interrogation after a momentary respite.

It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of Miranda by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking

of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the Miranda safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in the Miranda opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.

A reasonable and faithful interpretation of the Miranda opinion must rest on the intention of the Court in that case to adopt 'fully effective means ... to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored ...' 384 US, at 479, 16 L Ed 2d 694, 86 S Ct 1602 [at 1630], 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 20 ALR3rd 974. The critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' Id., at 474, 16 L Ed 2d 694, 86 S Ct 1602 [at 1628], 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974. Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'

Mosely, 423 U.S. at 101–104, 96 S.Ct. at 325–326, 46 L.Ed.2d at 320–321. The Court then went on to find that under the circumstances, Mosley's right to cut off questioning was fully respected since interrogation immediately ceased after he stated he wished to remain silent. Mosely, 423 U.S. at 104, 96 S.Ct. at 326, 46 L.Ed.2d at 321. Further, Mosley was carefully advised he was under no obligation to answer any questions and could remain silent if he wished. Id. Justice White, concurring in result, expressed the view that under the Miranda decision the proper standard for determining the admissibility of a custodial confession obtained after the accused's initial assertion of his right to silence should be whether the accused voluntarily waived his previously invoked right to silence. Mosely, 423 U.S. at 108, 96 S.Ct. at 328, 46 L.Ed.2d at 324.

On the other hand, the procedure police must follow when a suspect requests the presence of counsel before any custodial interrogation was set down by the United States Supreme Court in Edwards v. Arizona (1981), 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378. In that case, Edwards refused to talk to Arizona police, stating he wished to confer with counsel first. The police officers ceased interrogation when he requested counsel. The police, however, returned the next day without making counsel available to him and requested that he speak to them again. Edwards informed the detention officer that he did not want to talk to anyone but the guard told him "that he had to" talk to them. He did so, and after again being advised of his Miranda rights, he gave an incriminating statement. Justice White, writing for the majority this time, set out the procedure police must follow when interrogating an accused who has demanded counsel before speaking further:

" ... although we have held that after initially being advised of his Miranda rights, the accused may himself validly waive his rights and respond to interrogation, See North Carolina v. Butler, supra, [441 U.S. 369] at 372–376, 60 L.Ed.2d 286, 99 S Ct 1755 [at 1756–1759] the Court has strongly indicated that additional safeguards are necessary when the accused asks for counsel; and we now hold that when an accused has invoked his right to have counsel present during custodial interrogation, a valid

waiver of that right cannot be established by showing only that he responded to further police initiated custodial interrogation even if he has been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*

Miranda itself indicated that the assertion of the right to counsel was a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.' 384 US, at 474, 16 L.Ed.2d 694, 86 S Ct. 1602 [at 1628], 10 Ohio Misc 9, 36 Ohio Ops 2d 237, 10 ALR3d 974. Our later cases have not abandoned that view. In *Michigan v. Mosley*, 423 US 96, 46 L Ed 2d 313, 96 S Ct 321 (1975), *the Court noted that* Miranda *had distinguished between the procedural safeguards triggered by a request to remain silent and a request for an attorney and had required that interrogation cease until an attorney was present only if the individual stated that he wanted counsel.* 423 US at 104, n 10, 46 L Ed 2d 313, 96 S Ct 321; see also id., at 109–111, 46 L Ed 2d 313, 96 S Ct 321 *(White, J., concurring). In Fare v. Michael C., supra,* [442 U.S. 707] at 719, 61 L Ed 2d 197, 99 S Ct 2560 [at 2569], the Court referred to Miranda's rigid rule that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease.' And just last Term, in a case where a suspect in custody had invoked his Miranda right to counsel, the Court again referred to the 'undisputed right' under Miranda to remain silent and to be free of interrogation 'until he had consulted with a lawyer.' *Rhode Island v. Innis*, 446 US 291, 298, 64 L Ed 2d 297, 100 S Ct 1682 [1688] (1980). *We reconfirm these views and, to lend them substance, emphasize that*

*it is inconsistent with Miranda and its progeny' for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel."* [Emphasis added.] *Edwards,* 451 U.S. at 484, 101 S.Ct. at 1884–1885, 68 L.Ed.2d at 386. Justice White's majority opinion was joined by Justices Brennan, Stewart, Marshall, Blackmun, and Stevens. Chief Justice Burger concurring in judgment, expressed the view that the inquiry in these settings is whether resumption of interrogation is the result of a voluntary waiver, and that the inquiry should be resolved under the traditional voluntariness standard. *Edwards,* 451 U.S. at 488, 101 S.Ct at 1886–1887, 68 L.Ed.2d at 388–389. Justice Powell also wrote a concurring opinion, joined in by Justice Rehnquist, expressing the view that the standard for waiver of a constitutional right is whether the accused fully understands the right in question and voluntarily intends to relinquish that right. He would not superimpose a new element of proof on the established doctrine of waiver of counsel by creating a new *per se* rule requiring a threshold inquiry as to precisely who opened any conversation between an accused and state officials. *Edwards,* 451 .U.S. at 489–490, 101 S.Ct. at 1887–1888, 68 L.Ed.2d at 398–390.

In *Oregon v. Bradshaw* (1983), 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405, the United States Supreme Court, in a majority opinion written by Justice Rehnquist, reaffirmed its position that when an accused has requested counsel before speaking further, interrogation can be resumed only when the accused initiates a communication with police, and when it is apparent that he knowingly and intelligently waived his right to counsel. *Bradshaw,* 462 U.S. at 1044, 103 S.Ct. at 2834, 77 L.Ed.2d at 411–412. The court in *Bradshaw* found that the defendant had, in fact, initiated further discussion with the police by reopening dialogue about the investigation, and that, based on an investigation of the particular facts and circumstances surrounding the case, the defendant made a valid waiver of

his right to counsel and his right to silence. *Bradshaw*, 462 U.S. at 1046, 103 S.Ct. at 2835, 77 L.Ed.2d at 412–413.

It seems clear from these opinions that the United States Supreme Court intended and did set a separate and more stringent standard to be followed when an individual requests assistance of counsel before he speaks further. It also is clear the Court did not intend to expand this special procedure to the situation where the individual has only invoked his right to remain silent and there is no request for counsel. This was made clear by *Mosley* and has been so interpreted by the majority of federal and state jurisdictions, including this State. Where an individual has invoked his right to remain silent, it has been held that there is not a *per se* rule prohibiting the authorities from ever initiating a discussion or further questioning the individual on the subject. Rather, it must be shown on a case by case basis that the authorities "scrupulously honored" the defendant's right to cut off questioning at any time, and that he knew and understood these rights and voluntarily waived them. *Martin v. Wainwright* (11th Cir.1985), 770 F.2d 918; *Anderson v. Smith* (2nd Cir.1984), 751 F.2d 96; *United States v. Bosby* (11th Cir.1982), 675 F.2d 1174; *United States ex rel. Riley v. Franzen* (7th Cir.1981), 653 F.2d 1153 (the 7th Circuit here clearly makes the distinction between the right to remain silent and the right to counsel); *United States v. Hackley* (D.C.Cir.1980) 636 F.2d 493; *United States v. Boyce* (9th Cir.1979), 594 F.2d 1246; *Wilson v. Henderson* (2nd Cir.1978), 584 F.2d 1185 *cert. denied,* (1979), 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316; *United States v. Hernandez* (5th Cir.1978), 574 F.2d 1362.

This Court considered the precise question in *Lane v. State,* (1977), 266 Ind. 485, 364 N.E.2d 756. Lane surrendered to police, was advised of his rights and stated he did not want an attorney and he did not wish to speak to a detective at that time. Detective Allen, who was assigned to the case, was advised that Lane surrendered and did not care to speak at that time. Despite this, Allen revisited Lane and asked him if he wanted an attorney, to which Lane replied: "No." Allen then asked Lane if he wanted to make a statement, to which Lane replied: "Yes, I want to tell you all about it." In a unanimous opinion authored by Justice Hunter, this Court stated:

> "Although Lane at one point stated he did not wish to make a statement at that time, this was not such an assertion of his right to remain silent as would prohibit police officers from later asking if he wished to make a statement. Even after an unequivocal assertion by an accused of his right to silence, there is not a *per se* proscription of further interrogation. *Michigan v. Mosley, supra.* The officers did not hold Lane incommunicado for an extended period of time, extracting a confession only after prolonged interrogation. In fact, it seems that no interrogation occurred at all. The officers merely asked, on two separate occasions, if the defendant wished to make a statement. The record supports the trial court's conclusion that the defendant's right to remain silent was scrupulously honored and that he made his confession after a valid waiver of that right."

*Lane,* 266 Ind. at 490, 364 N.E.2d at 759. Other state courts have taken the same position in interpreting *Mosley,* but it is not necessary to lengthen this opinion by setting them out here.

In this case, Appellant Moore was given his *Miranda* rights, acknowledged he well understood them, including his right to remain silent, and declined to talk to the Milwaukee police. Hours later, Moore was asked to consent to a search of his residence for a .22 caliber pistol believed to be the murder weapon. Moore consented. The next day, Moore was questioned by South Bend police. The South Bend police fully readvised him of his rights before he willingly talked to them, which resulted in his first confession. There is no showing that the police did not scrupulously honor his right to remain silent nor that he failed to know and recognize his right before

waiving it. Moore further demonstrated he was aware of this by initiating further discussion with the police which resulted in a second statement being given. Accordingly, there is no error here.

Furthermore, to the extent that *Phillips* has been interpreted to equate the waiver requirements where a defendant invokes his right to remain silent with his right to counsel, we hereby set aside *Phillips*. In Indiana, when a suspect invokes his right to remain silent, the police must "scrupulously honor" that right. This is all the law requires and the reasons are apparent. The "scrupulously honored" test strikes a balance between the accused's right to be free from coerced interrogation, and the State's interest in using custodial interrogation as an effective and efficient investigatory tool. The burden remains on the State to show the police scrupulously honored the accused's right to remain silent.

## IV

. ▮ Finally, Appellant assigns as error the insufficiency of evidence presented at trial to support a conviction of robbery. Specifically, Appellant claims the State neither proved he took property from the victim nor established he caused the victim bodily injury.

Ind.Code § 35–42–5–1 (Burns Supp.1983), which governs here, proscribed robbery as follows:

"Sec. 1. A person who knowingly or intentionally takes property from another person or from the presence of another person:

(1) by using or threatening the use of force on any person; or

(2) by putting any person in fear; commits robbery, a Class C felony. However, the offense is a Class B felony if it is committed while armed with a deadly weapon, and a class A felony if it results in either bodily injury or serious bodily injury to any person other than a defendant."

Where the sufficiency of evidence is challenged, the court on review will neither weigh the evidence nor judge the credibility of witnesses, rather it will consider the evidence most favorable to the State together with all reasonable inferences therefrom. If there is substantial evidence of probative value to support the conclusion of the trier of fact, the verdict will not be overturned. *Robinson v. State* (1985), Ind., 486 N.E.2d 986, 988.

Appellant argues that the State failed to show he took the television from the presence of the victim. However, in his second statement given to police, Appellant admitted that he beat the victim and left him lying on the den floor. After searching the victim's trousers in the bedroom, he walked past the victim still lying on the den floor to get the portable television set. According to Appellant's statement, the victim grabbed for Appellant and Appellant then bound him, took the television set from the den into the kitchen, found the keys to the victim's truck, transported the television set onto the truck and fled. By Appellant's own admission, he took the television from the victim's presence.

Appellant's claim that the State failed to present sufficient proof that he inflicted bodily injury upon the victim also is unconvincing. Ind.Code § 35–41–1–4 (Burns Supp.1983) defined bodily injury as, "any impairment of physical condition, including physical pain." The doctor treating the victim, who was discovered the evening the robbery occurred, testified the victim sustained multiple abrasions, severe bruises, and fractures of the left facial bones and the right humerus bones. Appellant also confessed to beating the victim during the perpetration of the robbery. In conjunction with the other evidence adduced at trial and heretofore mentioned, there was sufficient evidence to support the jury's findings that Appellant took the television from the presence of the victim, that Appellant inflicted bodily injury upon the victim, and that Appellant committed this robbery.

The trial court is in all things affirmed.

GIVAN, C.J., and DICKSON, J., concur.

SHEPARD, J., dissents with separate opinion in which DeBRULER, J., concurs.

SHEPARD, Justice, dissenting.

In setting aside our decision in *Phillips v. State* (1986), Ind., 492 N.E.2d 10, the Court does several remarkable things. First, it overrules a decision reached without dissent only six months ago. Second, it does so without finding any particular reason why that decision should not be regarded as *stare decisis*. Third, it chooses a new standard plainly at variance with existing Fifth Amendment case law.

Judges should always be alert to the fact that existing case law may outlive its usefulness and we should be willing to test old rules against current reality. Nevertheless, a court which leaps from one side of a question to another creates confusion in the profession and among the citizenry about what the law really is at any given moment in time. This Court has traditionally held that *stare decisis* requires that a rule be followed unless it now appears from experience that it "works an obvious injustice upon litigants and is not supported by any authority." *New York, Cincinnati, and St. Louis Railroad Co. v. Henderson* (1958), 237 Ind. 456, 465, 146 N.E.2d 531, 537. *Accord, Brooks v. Robinson* (1972), 259 Ind. 16, 284 N.E.2d 794.

As for the merits of today's change in heart about what the Fifth Amendment of the United States Constitution requires, I choose not to belabor the point except to say that I believe that we properly interpreted the Fifth Amendment in *Phillips*. To belittle that decision by calling it *dicta* seems to me unbecoming.

The central thesis of the majority's position appears to be that a prisoner who asks for his lawyer may not be badgered but that one who tells the authorities that he wishes to invoke his right to remain silent may be. What good is the attorney, pray tell, if not to assure that the accused does not say something or consent to something that may not be in his best interests?

Although it is convenient to pass over the record in order to make today's decision seem more palatable, I submit that the evidence reveals a great deal about the fate of future appellants who come to this Court seeking vindication of their Fifth Amendment rights. The first time Moore was questioned, he asserted his innocence and invoked his right to remain silent. *Knowing* that he had done so, a second officer decided to attempt a further conversation in the hope that Moore could be persuaded to consent to a search of his residence. The next day, yet another attempt was made to elicit a confession from the defendant notwithstanding his expressed desire not to be questioned. If this set of efforts demonstrates that the authorities "scrupulous honored" a defendant's decision not to speak, it is difficult to foresee that any defendant will ever receive relief from this Court by citing the Fifth Amendment.

To rely on *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), for today's decision is especially amazing. It is correct that the inquiry to be made about the voluntariness of a confession made by a prisoner who has invoked his right to remain silent is whether the police "scrupulously honored" his request. The *Mosley* Court made it plain enough what "scrupulously honored" meant. When Mosley invoked his right to remain silent, interrogation ceased immediately, the officer did not try to resume questioning or to persuade Mosley to reconsider, and Mosley was read his *Miranda* rights before interrogation commenced concerning *another* offense. *Mosley*, 423 U.S. at 104, 96 S.Ct. at 327, 46 L.Ed.2d at 322.

To rely on *Mosley* as authority for the idea that the Fifth Amendment permits police to attempt to persuade prisoners to change their mind about invoking their rights so as to permit further interrogation is beyond the pale.

DeBRULER, J., joins in this dissent.