Harry G. AUTEN, Martha E. McFall, Barbara L. Winchester, Appellants (Defendants below),

v.

STATE of Indiana, Appellee (Plaintiff below).

No. 35A02-8807-CR-286.[1]

Court of Appeals of Indiana, First District.

Aug. 8, 1989.

---

1. This case was diverted from the Second District by direction of the Chief Judge.

Bruce M. Frey, Guerrero, Guerrero & Guerrero, Marion, Ind., for appellants.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, for appellee.

ROBERTSON, Judge.

Appellants-defendants Harry Auten, Martha McFall and Barbara Winchester ap-

peal their convictions of professional gambling, a class D felony.

We affirm the convictions of Auten and McFall, and reverse that of Winchester.

After investigating the Midway Recreation Center, police arrested the owners and several of the employees, including the defendants herein. Each was charged with one count of professional gambling. Police had observed Auten selling bingo cards and McFall selling tip cards. The police could not recall Winchester's activities, but she had given a statement implicating herself in selling bankers at the Midway. Auten and McFall had also given statements to the police.

After a jury trial, the defendants were convicted of professional gambling. They appeal, raising these five issues:

I.   Whether the statements of the defendants were voluntarily and knowingly given.

II.  Whether the evidence was sufficient to sustain the convictions for professional gambling.

III. Whether the court erred in refusing to instruct the jury on the offense of unlawful gambling.

IV.  Whether the court abused its discretion in sentencing the defendants when it failed to set out its reasons for imposing the sentence and when it imposed a fine on McFall and Winchester but not Auten.

V.   Whether subsection 6 of IND.CODE 35–45–5–3 is unconstitutionally vague.

## I.

Defendants contend that their statements were involuntary because they were induced by assurances that the police were only interested in the owners, not the employees. In addition, Winchester argues that her confession was not voluntary because police continued to question her after she had invoked her right to remain silent.

The issue with respect to Auten and McFall's statements is waived, because the appellate brief does not set out the argument with citation to the record with respect to McFall, and at trial, Auten's attor-

ney indicated he had no objection to the admission of Auten's statement. R. 462. See, Ferry v. State (1983), Ind., 453 N.E.2d 207; Schweitzer v. State (1989), Ind., 531 N.E.2d 1386.

The specific issue with respect to the voluntariness of Winchester's statement is whether she had invoked her right to remain silent and, if so, whether the police "scrupulously honored" her right. The State contends that the record shows only that Winchester refused to sign the written waiver of rights form, and that her mere refusal to sign the waiver form does not alone constitute an exercise of her rights, citing Norris v. State (1986), Ind., 498 N.E.2d 1203 and Lee v. State (1988), Ind., 531 N.E.2d 1165.

The admissibility of a statement or confession is controlled by determining from the totality of circumstances whether or not a confession was given voluntarily and not through inducement, violence, threats or other improper influences so as to overcome the will of an accused. Moore v. State (1986), Ind., 498 N.E.2d 1. The burden is on the State to show beyond a reasonable doubt that police scrupulously honored the accused's right to remain silent. Id.

Our supreme court has examined the issue of a defendant's invoking his right to remain silent by refusing to sign a waiver form, and has come to seemingly contradictory conclusions. However, closer scrutiny of the cases enables us to harmonize them and consequently resolve the issue in this case. The more recent supreme court cases relied upon by the State suggest that the mere refusal to sign the waiver of rights form does not in and of itself constitute an exercise of Miranda rights. Norris, supra; Lee, supra. These cases relied on Hill v. State (1978), 267 Ind. 480, 371 N.E.2d 1303, in which the court stated that the defendant, who had earlier refused to sign a waiver but had initiated a statement later, could not contend that his right against self-incrimination was "violated simply because he refused to sign a waiver form." Id. at 1306. In Norris, the defendant refused to sign a waiver form because

an attorney had told him never to sign anything without an attorney being present. He then stated "I'll be more than happy to cooperate and tell you what happened." Hence, because the defendant's volunteered narrative was in no way encouraged by police questioning, his mere refusal to sign the waiver form was not an exercise of his right to remain silent. In *Lee*, the defendant was not presented a waiver form to sign, but had spoken freely about the incident after receiving *Miranda* warnings. *Lee, supra* at 1167. The State's interpretation of *Norris* and *Lee* would require us to hold that the refusal to sign a waiver of rights form, by itself, is never enough to show that defendant invoked his right to remain silent. While that interpretation seems fair given the wording of the rule, we nevertheless conclude that the import of those cases is that the defendant's refusal to sign a waiver form will not overcome other evidence that defendant's decision to talk was freely self-determined. *See Jackson v. State* (1986), Ind., 496 N.E.2d 32. Accordingly, a defendant *may* invoke his right to remain silent by refusing to sign a waiver of rights form, but such refusal may not *necessarily* serve as an invocation.

We reach that conclusion because of the continued vitality of *Benton v. State* (1980), 273 Ind. 34, 401 N.E.2d 697, in which the court relied on *Brown v. State* (1971), 256 Ind. 558, 270 N.E.2d 751. In *Benton*, defendant's refusal to sign the waiver of rights form was an explicit, voluntary and knowing refusal to waive his rights. The court observed that "by refusing to sign the form, appellant was repudiating the notion that he was 'willing to make a statement and answer questions' and that he did 'not want a lawyer at this time.'" *Id.*, 401 N.E.2d at 698. The court distinguished the circumstances in *Benton* from those cases in which the defendant volunteered a statement without prodding by the police.

Hence, we must examine the circumstances of the case at bar to determine whether Winchester had invoked her right to remain silent and, if so, whether the police scrupulously honored her right to cut off questioning at any time. *See Moore, supra.*

Police officer Farthing testified that he read Winchester her rights and the waiver statement on two occasions after she was arrested: at 11:12 p.m. the night of her arrest, and again at 2:25 a.m., over 3 hours later. Both times she refused to sign the form, which contained on one sheet both an advisement of her rights and a waiver statement. Preliminary questions asked by Winchester's attorney of the interrogating officer Farthing established what occurred after Winchester refused to sign the waiver form:

Q. Officer, what does it mean when the witness refuses to sign the waiver of rights?

A. She just refused to sign the form.

Q. Well, what is your basis for concluding that she waived her rights?

A. That she understood the form and did not want [an] attorney present at that time.

Q. Is that your conclusion or did she say that?

A. I read the form to her and it states that in the form there. She did not request not to talk with me.

Q. You, you asked her if she wanted to make a statement. Is that correct?

A. I asked her if she'd talk with me. Yes.

Q. And then you gave her this document . . .

\* \* \* \* \* \*

A. Right.

Q. Did she say that she just refused to sign or did she refuse to waive her rights?

A. Refused to sign.

Q. But she wanted to waive her rights?

A. Yes, but she would not sign the form. She would not sign any form.

Q. And did she say why she didn't want to sign the form?

A. Nope. She did not.

Q. Did she ever indicate to you she wanted to talk with an attorney?

A. No.  She did not.

Q. Did she have any questions about what it meant if she signed the form?

A. Nope.  She didn't question the form.

\*    \*    \*    \*    \*    \*

Q. What happened after you talked to her the first time?

A. Well, she was placed back with other people and then transported to the county jail.

Q. But she didn't give any statement at that time, did she?

A. No.  She refused to talk to me at that time.

Q. Why?

A. I do not know why.

Q. So you went back to do it the second time?  You are telling me that she refused to sign this—at 11:12 p.m., you read her her rights and she refuses to sign, refuses to talk to you. Right?

A. That is correct.

Q. Because she wanted what?  A lawyer present?  Wanted to exercise her right to remain silent?

A. She never admitted it.  No.

Q. It indicates she did not want to talk to you.  Correct?

A. At that point, yes.

Q. At that point.  So the next thing, three hours later, you are back talking to her again.  Right?

A. Yes.

Q. You've got another waiver form. Right?

A. Yes.

Q. Now we go through this whole process all over again?

A. That is correct.

Q. And she says what?  I don't want to sign the waiver?

A. That is correct.

\*    \*    \*    \*    \*    \*

Q. But the first one she refused to sign and three hours later, she is still refusing to sign statements?    Correct?

A. That is correct.

Q. But then she gave you the taped interview?

A. That is correct.

The State continued direct examination of Farthing:

Q. Mr. Farthing, after Ms. Winchester had been twice advised in this respect, she did talk to you.  Is that correct?

A. That's correct.

Q. She didn't ask to see an attorney?

A. No.

Q. She didn't say she didn't want to, at 2:25 a.m., that she didn't want to talk to you?

A. No, she didn't.  She openly talked to me about it.

Winchester's testimony revealed that she refused to sign the waiver form because she assumed if she signed it, that she would be giving up her rights.  R. 442. After Winchester refused to sign the first time, Farthing left, but returned a second time several hours later, read her the advisement of rights, and took her tape recorded statement.

The evidence presented leads us to conclude that Winchester had invoked her right to remain silent by refusing to sign the waiver form.  Winchester offered no explanation for her refusal which might have shown she was equivocal about remaining silent.  Furthermore, she at no time initiated a discussion.

■ There is no *per se* rule prohibiting the authorities from ever initiating a discussion or further questioning an individual once he has invoked his right to remain silent.  *Moore, supra.*  Rather, it must be shown on a case-by-case basis that the authorities "scrupulously honored" the defendant's right to cut off questioning at any time, and that the defendant knew and understood these rights and voluntarily waived them.  *Id.,* 498 N.E.2d at 9.

■ Without presenting any evidence bearing on what transpired between the

second refusal to sign the waiver form and the giving of a statement, we are left to wonder whether the police scrupulously honored Winchester's refusal to talk. Certainly, the mere fact that she gave a statement does not demonstrate she waived her rights. A valid waiver will not be presumed simply from the fact that a confession was in fact eventually obtained. *Brown, supra,* citing *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

■ The State has not met its burden of proving that Winchester's right to remain silent was scrupulously honored. Farthing's conclusory statement that Winchester "wanted to waive her rights" even though she refused to sign the form is not sufficient to show that Winchester knew and understood her rights and that she wished to waive her right to cut off questioning at any time. Farthing did not testify how Winchester had manifested her desire to waive her rights. The evidence only shows, instead, that after refusing twice to sign the waiver form, she suddenly "talked openly about it." Yet, there is no evidence that Winchester initiated the conversation.

■ We may disturb the trial court's finding of voluntariness of a confession only if there is no substantial evidence to support the ruling. *Moore, supra.* On that basis, we hold that Winchester's statement was not voluntary, and the trial court erred in admitting it at the trial.

## II.

■ For the defendants' next issue, they argue that the evidence was insufficient to support the verdicts. Before we discuss the elements of professional gambling which the State had the burden to prove, we must acknowledge the State's concession that in the absence of Winchester's statement, there was not sufficient evidence to support the verdict against her. Appellee brief at 11. The two witnesses who testified they saw her at the Midway could not recall her activities. Because we have found her statement was inadmissible, we must reverse her conviction.

Auten and McFall argue that because they received only a weekly paycheck for their efforts at the Midway, and had never directly received any part of the proceeds of the gambling operation, they could not be convicted of professional gambling. Defendants concede that the patrons were gambling and that, as part of the defendants' employment, defendants sold tips and collected proceeds from the bingo game.

The defendants rely upon *State v. Stone* (1974), 160 Ind.App. 226, 311 N.E.2d 446 for their supposition that the State had to prove they had a "fixed share of the stakes" of the gambling operation. Their reliance on *Stone* is misplaced; the statute under which that defendant was charged required the State to prove the defendant was "conducting any banking or percentage games played with cards, dice, or counters, or accepting any fixed share of the stakes therein." IND.CODE (1971) 35–25–1–2. Defendants in the instant case were charged under I.C. 35–45–5–3(6): "A person who knowingly or intentionally: accepts, or offers to accept, for profit, money or other property risked in gambling; commits professional gambling." Under I.C. 35–45–5–1, we find the following definitions:

"Gambling" means risking money or other property for gain, contingent in whole or in part upon lot, chance, or the operation of a gambling device; but it does not include participating in:

(1) bona fide contests of skill, speed, strength, or endurance in which awards are made only to entrants or the owners of entries; or

(2) bona fide business transactions that are valid under the law of contracts.

\* \* \* \* \* \*

"Profit" means a realized or unrealized benefit (other than a gain) and includes benefits from proprietorship or management and unequal advantage in a series of transactions.

"Gain" means the direct realization of winnings.

Defendants concede that the customers of the Midway were engaged in gambling;

defendants merely dispute that they could be guilty of professional gambling when only the owners retained the proceeds of the operation for profit. However, "profit" under the statute is a realized or unrealized benefit. A benefit is an "advantage; profit; fruit; privilege; gain; interest; the receiving as the exchange for promise some performance or forbearance which promisor was not previously entitled to receive." *Black's Law Dictionary* 143 (5th ed. 1979) Under the statutory definition of profit, a weekly paycheck in exchange for services would be a profit. Accordingly, when defendants, as part of their employment, collected proceeds from the gambling operations and received a paycheck for doing it, they accepted, for profit, money risked in gambling. The statute does not require the state to prove the defendants had a fixed share of the stakes, or that the defendants had an ownership interest in the enterprise.

Moreover, evidence will be sufficient if it supports a finding either that the appellant actually perpetrated the crime or that the appellant aided, abetted or encouraged the commission of that felony. *George v. State* (1969), 252 Ind. 344, 247 N.E.2d 823; *Prather v. State* (1969), 252 Ind. 141, 246 N.E.2d 479. Because the accessory statute covers all crimes in Indiana, the evidence will be sufficient if it shows appellant was an accessory to the principal offense. *George, supra.* The evidence showed defendants in this case were aiding and abetting the owners who were profitting from gambling; hence, there was sufficient evidence to find defendants guilty of professional gambling.

### III.

■ Defendants tendered their final instruction number one, which the court refused to read.

Under an information for Professional Gambling, a class D felony, it is possible, if the evidence warrants, to find the defendants guilty of unlawful gambling, a class B misdemeanor. I.C. 35–45–5–2.

Defendants contend the trial court should have read the instruction because gambling was a lesser-included offense. The first step of the test set out in *Lawrence v. State* (1978), 268 Ind. 330, 375 N.E.2d 208 is to examine the statutes defining the greater and lesser offenses and the charging information or indictment, and to determine therefrom whether a conviction of the crime charged necessitates proof of all the essential elements of the lesser offense, together with the added element which makes the difference in the two offenses. If this test is not satisfied, the instruction should not be given. *Id.,* 375 N.E.2d at 212.

A person who knowingly or intentionally engages in gambling commits, unlawful gambling, a class B misdemeanor. I.C. 35–45–5–2. "Gambling" means risking money or other property for gain, contingent in whole or in part upon lot, chance, or the operation of a gambling device. I.C. 35–45–5–1. "Gain" means direct realization of winnings. I.C. 35–45–5–1.

A conviction of the crime of professional gambling, in this case, necessitated proof that defendants accepted, or offered to accept, for profit, money or other property risked in gambling. None of the elements of professional gambling are required to prove the offense of gambling. Accordingly, gambling is not a lesser-included offense of professional gambling.

Defendants invite us to embrace the doctrine of "related offenses" explained in *Mahla v. State* (1986), Ind., 496 N.E.2d 568, 573–74. We need not adopt or reject the doctrine in this case, because it would only apply, by definition, to a case in which the evidence supports the related offense. *Id.* at 574. No evidence supported a conviction of gambling in this case, because the prosecution did not show that the defendants risked money or other property for gain, or for "direct realization of winnings." *See* I.C. 35–45–5–1. The trial court properly refused Defendants' tendered instruction number one.

### IV.

■ Defendants next argue that the trial court's sentencing was erroneous because it failed to set out sufficient reasons for 1) imposing a fine on McFall and Winchester but not on Auten, and 2) for sus-

pending all but 60 days of the two-year presumptive sentence. Defendants reason that since the trial court evidently found some matters in mitigation, a disclosure of those matters might warrant a suspension even greater than was granted.

It is true that the trial court should have provided a statement explaining its sentencing. When a judge increases or decreases a basic sentence, suspends the sentence, or imposes consecutive terms of imprisonment, the record must disclose what factors were considered by the judge to be mitigating or aggravating circumstances. *Washington v. State* (1981), Ind., 422 N.E.2d 1218. However, an appellant cannot successfully claim prejudicial error because he received a lesser punishment than that prescribed by statute. *Harvey v. State* (1986), Ind., 498 N.E.2d 1231.

■ Defendants have waived the issue with respect to the fine, since it was not set out with sufficient specificity in the motion to correct error. The motion only says there was no rational basis for sentencing each of the defendants to different sentences. It fails to specify the fine and as to which defendants the fine was imposed. Also, defendants have failed to cite any authority supporting the requirement of consistency with respect to imposing fines. The statute authorizing a fine of not more than $10,000 for a class D felony appears to leave the matter to the court's sound discretion. I.C. 35–50–2–7. Having failed to present any error, we will not reverse on this issue.

## V.

■ In defendants' final issue they challenge the constitutionality of subsection 6 of I.C. 35–45–5–3. They suggest two scenarios in which certain activities could be considered professional gambling under subsection 6.

We are mindful of the heavy burden defendants face when they launch an attack on the statute's constitutionality:

Legislation under constitutional attack is clothed with a presumption of constitutionality. A statute will not be found unconstitutionally vague when the language is sufficiently definite to inform a person of ordinary intelligence of a conduct which is prohibited. Meticulous exactitude and absolute precision are not required in drafting statutes. The specificity that due process requires may be ascertained by reference to the entire text of the statute, to well-settled common law meanings, to prior judicial decisions, to similar statutes, or to common generally accepted usage. If an offense can be made constitutionally definite by reasonable construction, the court's duty is to give the statute that construction. [Citations omitted.]

*Bozarth v. State* (1988), Ind.App., 520 N.E.2d 460.

■ Essentially, defendants claim the statute is vague because a person of reasonable intelligence must speculate whether he may have committed the offense of professional gambling when he bet and won on the Super Bowl. Defendants tacitly concede, as they must, that betting on the Super Bowl would constitute gambling. However, defendants reason that the bettor who won $500 on his wager would have "accepted the profits of his own wager." A literal reading of the statute reveals the speciousness of this argument. Defendants ignore the fact that "profit" has a special meaning in the statute quite apart from the general usage. The definition of "profit" explicitly excludes "gain," which is the "direct realization of winnings." Therefore, a literal reading of the statute discloses that mere bettors on the Super Bowl are not committing professional gambling under subsection 6.

Their second scenario is similarly faulty. They suggest that the activities of a brokerage firm in purchasing stocks on margin implicates professional gambling. However, the gambling statute excepts from the definition of gambling (and hence from 35–45–5–3(6)) bona fide business transactions that are valid under the law of contracts. Defendants do not argue that exempting such business transactions from the operation of the gambling laws is an invalid classification. *See Fairchild v. Schanke* (1953), 232 Ind. 480, 113 N.E.2d 159 (striking down gambling statute exempting religious, patriotic, charitable and fraternal clubs). Only vagueness of the

language is challenged. Defendants have not overcome their heavy burden of showing the statute is unconstitutionally vague.

The convictions of McFall and Auten are affirmed; the conviction of Winchester is reversed.

BAKER, J., concurs.

BUCHANAN, J., concurs in part and dissents in part with separate opinion.

BUCHANAN, Judge, dissenting in part and concurring in part.

While I concur with the majority's conclusion that Auten's and McFall's convictions should be affirmed, I dissent from the majority's decision to reverse Winchester's conviction.

To conclude that Winchester invoked her right to remain silent one must necessarily reweigh the evidence. There is evidence both ways.

Officer Farthing testified:

"Q. Did she say that she just refused to sign or did she refuse to waive her rights?

A. Refused to sign.

Q. *But she wanted to waive her rights?*

A. *Yes,* but she would not *sign* the form. She would not sign any form.

Q. *And did she say why she didn't want to sign the form?*

A. *Nope. She did not.*

Q. Did she ever indicate to you she wanted to talk with an attorney?

A. No. She did not.

Q. Did she have any questions about what it meant if she signed the form?

A. Nope. She didn't question the form."

*Record* at 429 (emphasis supplied).

Our supreme court has determined that the mere refusal to sign a waiver form does not, by itself, constitute an exercise of a defendant's right to remain silent. *Norris v. State* (1986), Ind., 498 N.E.2d 1203. The only evidence the majority points to, to support its conclusion that Winchester invoked her right to remain silent, was her self-serving statement at trial that she re-fused to sign the waiver form because she assumed she would be giving up her rights. *Record* at 442. Thus, there was conflict in the evidence before the trial court.

The court in *Norris, supra,* was faced with a similar circumstance when a defendant refused to sign a waiver form but nonetheless gave the police a statement. In observing that the mere refusal to sign did not constitute an exercise of the defendant's right to remain silent, the court observed "[t]his is especially true where the defendant, as Appellant here, volunteers a statement." *Id.* at 1204. If this were not so, custodial authorities are forced to gaze into a crystal ball to ascertain whether refusal to sign a waiver form constitutes exercise of a defendant's right to remain silent.

Here, as in *Norris,* Winchester merely refused, without explanation, to sign the form. She then gave a statement, which casts doubt upon whether she invoked her right to remain silent. Because there was sufficient evidence to support the trial court's conclusion that Winchester did not invoke her right to remain silent, we should affirm her conviction.