# FOR PUBLICATION



ATTORNEYS FOR APPELLANT:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
**JESSE R. DRUM**
Deputy Attorneys General
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**LEANNA WEISSMANN**
Lawrenceburg, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellant-Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 69A01-1405-CR-186 |
| | ) | |
| ALLISON MOORE, | ) | |
| | ) | |
| Appellee-Defendant. | ) | |

INTERLOCUTORY APPEAL FROM THE RIPLEY CIRCUIT COURT
The Honorable Carl H. Taul, Judge
Cause No. 69C01-1301-MR-1

**December 29, 2014**

**OPINION – FOR PUBLICATION**

**BRADFORD, Judge**

**CASE SUMMARY**[1]

Late in the evening of December 29, 2012, Ryan Jackson's home in Cross Plains, Indiana was broken into, and Jackson was robbed at gunpoint. Early the next morning, Nancy Hershman was shot and killed during a break-in at her home in Milan, Indiana. Based on information provided by Jackson, authorities were soon pointed in the direction of D.H. as a suspect, and he confessed his participation in the robbery and the homicide while also implicating Appellee-Defendant Allison Moore and three others. Moore was arrested in her Ohio residence and transported to the Colerain Township Police Department, where she was placed in an interrogation room. At the time of her arrest, Moore was babysitting four children. Indiana State Police Detectives Tom Baxter and Vince Patton met with Moore and advised her of her *Miranda*[2] rights. Moore soon indicated that she did not want to talk to the police, and the discussion regarding the criminal investigation was suspended.

Soon thereafter, Indiana State Police Sergeant Anthony Scott entered and asked Moore about the four children in her care when she was arrested. After contentiously conversing with Sergeant Moore about the children, Moore requested that Detective Baxter return. Moore spoke with Detective Baxter about the children and then asked what the other suspects were saying about her. Without re-*Mirandizing* Moore, Detective Baxter verified

---

[1]  We heard oral argument in this case on December 9, 2014, at Ben Davis High School in Indianapolis. We thank the administration, faculty, staff, and students of Ben Davis for their hospitality and counsel for quality of their presentations.

[2]  *Miranda v. Arizona*, 384 U.S. 436 (1966).

that Moore now wanted to speak with him. Moore then made statements incriminating herself in the robbery of Jackson and Hershman's death.

Appellant-Plaintiff the State of Indiana ("the State") charged Moore with felony murder, Class B felony burglary, and Class B felony conspiracy to commit burglary. The State later added a charge of intentional murder and requested that Moore receive a sentence of life without parole. Moore filed a motion to suppress her statements to police, and the trial court granted Moore's motion following a hearing. The trial court granted the State's motion for certification of the matter for interlocutory appeal, and this court accepted jurisdiction. The State contends that the trial court erroneously granted Moore's motion to suppress because she waived her right to silence by reinitiating the conversation with police. Moore contends that police continued to question her after she invoked her right to silence and that police interference led to her giving a statement without being re-*Mirandized*.

We affirm.

## FACTS AND PROCEDURAL HISTORY

At approximately 11:30 p.m. on December 29. 2012, D.H. and his friends S.N., B.N., Moore, and K.B. went to Jackson's Cross Plains home. D.H. kicked in the door, and the group stole approximately $700.00 and some marijuana. Early the next morning, the group went to Hershman's Milan home. Once at Hershman's home, D.H. kicked in the door, and he, S.N., and Moore entered the residence. During a confrontation between Moore and Hershman, Hershman was shot in the head and died from her wound.

3

Jackson indicated to police that he recognized one of his assailants as D.H. because D.H. had done some work on his home, and police spoke to D.H. on January 5, 2013. D.H. admitted his involvement in the robbery at Jackson's home and the homicide at Hershman's and also implicated Moore, S.N., B.N., and K.B.

On January 5, 2013, Ohio authorities arrested Moore at her residence, where she was babysitting four children, and transported her to the Colerain Township Police Department in Ohio. Detectives Patton and Baxter met with Moore, and the following exchange occurred:

BAXTER: I'm gonna read these sentences to you um and I just want to make sure you understand it. You have the right to remain silent. Do you understand that?

ALLISON: Uh huh.

BAXTER: Okay. Anything you say can be used against you in court. You understand that?

ALLISON: Like court for what though?

BAXTER: Oh we'll … we'll talk about that. You have the right to talk to a lawyer for advice before you are asked any questions and to have him with you during questioning. Does that make sense to you?

ALLISON: Yeah.

BAXTER: Okay. If you … if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. Okay?

ALLISON: Well can I do … can I have you guys question me and then depending on what it is can I ask for a lawyer?

BAXTER: Yes, you have the right to stop answering at any time.

ALLISON: Okay that's good. I am kind of not even sure what's going on.

BAXTER: I'll explain it all to you and … and be Mr. nice guy okay?

ALLISON: Okay.

PATTON: Listen to this next section here.

BAXTER: If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

ALLISON: Okay.

BAXTER: If you understand, now what I ask you to do is … is just acknowledge that you understand all those rights I've explained to you.

ALLISON: Yes.

BAXTER: Would you write yes in there please? Having these rights in front of you, do you wish to talk to me now?

ALLISON: Yes.

BAXTER: Okay. And just put the date and the time and put your signature there.

ALLISON: What'd you say your name was again?

BAXTER: Tom Baxter.

ALLISON: Tom.

PATTON: And I'm Vance.

ALLISON: Vance, I'm not gonna remember that.

PATTON: ??????

BAXTER: You um … I'm investigating uh something that happened over in Indiana last weekend. It's been about a week ago. And I'm gonna ask you to talk to me about it, okay? I think … I try not to beat around the bush too long, okay? Um but I wanna tell you where I'm going. Um before we get into the details too much, I … I just want to tell you that I've … there's … there's been more than one person that's been interviewed today, okay?

ALLISON: Yeah.

BAXTER: And the others are upset, okay? And they just wanna get it off their chest, alright? And I wanna give you that same opportunity as to do that as well. Uh I know what happened in both places, okay? And I need to know what kind of person you are and I need to know why it happened.

ALLISON: I don't know what happened.

BAXTER: Well Allison um I know who … who went to Indiana, okay? We're dealing with five people, okay? And I knew that you were …. I know that you were present, okay? And there was two houses that were went to, one in Cross Plains and one in Milan, alright? And I know some things went wrong, okay? And as I explained to you before, um we've talked to some of the other people that were there and they've been pretty honest about what happened, okay? And I … I guess we … we need to talk about it.

ALLISON: My thing is, like I told you, I don't have no reason to go to Indiana. I don't know nobody in Indiana. I can have my sister tell you I was with her. If there's no evidence against me, I

5

|  |  |
|---|---|
| | can't really say nothing because I wasn't in Indiana, so, with that being said, I'm done. |
| BAXTER: | So you don't wanna talk to me anymore? |
| ALLISON: | No, because this is just gonna go down the way that you guys are trying to make it go down. Like I said, I don't know nobody in Indiana. I was with my family last weekend. And they can tell you that. |
| PATTON: | Who … who were you with Allison? |
| ALLISON: | I was with my sister. |
| PATTON: | What's her name? |
| ALLISON: | Neesha. She's down in Georgia right now. |
| PATTON: | She was in … were you in Georgia when you were … |
| ALLISON: | No, she just went down to Georgia on Wednesday. |
| PATTON: | Is she a Moore? |
| ALLISON: | No, she's a Robinson. Her real name is Sharon but Neesha is her family name. |
| BAXTER: | Okay, so are you telling me that we're not gonna talk? |
| ALLISON: | That's what I'm saying. |
| BAXTER: | Okay, well I guess I'll conclude this interview. It was my hope that you would cooperate today. |
| ALLISON: | I've … I've … I've told you what I know. That's … I'm cooperating. |
| BAXTER: | No, I don't think you're cooperating right now so I think I'm just gonna have to conclude this interview and we will rely on the others and we'll just have to see how this investigation goes. So you're telling me that you don't want to talk to me right now? |
| ALLISON | Uh huh. |
| BAXTER: | Okay. Well I'm just gonna leave you sitting in here for a few minutes okay? |
| ALLISON: | Okay. |
| BAXTER: | If you change your mind I will be out here. |
| ALLISON: | ???????????? Thank you. |
| (Baxter & Patton leave) | |
| ALLISON: | (Knocks) Since we're concluding this interview can I leave? Am I allowed to leave? |
| BAXTER: | Not yet. |
| ALLISON: | Okay. |
| (F/Sergeant Anthony Scott) | |
| SCOTT: | Allison who are the parents of the kids that are at your house? Or who are the kids? |
| ALLISON: | Is my mom there … here? |

SCOTT: Yeah, but there's some kids there. Your mom don't know who the kids are.

ALLISON: Yeah, they're my kids. They're uh can I speak with my mother?

SCOTT: Well she's trying to come here but she doesn't know what to do with the kids.

ALLISON: Tell her to bring them with her cause they're with me till tomorrow.

SCOTT: Can you tell me who the kids are?

ALLISON: Yeah, their names are Emir, Aliyah, Aariona, and Emari.

SCOTT: Okay you gotta slow down a little bit.

ALLISON: Emir …

SCOTT: Spell that.

ALLISON: E-M-I-R. Aliyah …

SCOTT: A …

ALLISON: A-L-I-Y-A-H. [Aariona], A-A-R-I-O-N-A. Emari, E-M-A-R-I.

SCOTT: M-E … say that again.

ALLISON: A-R-I.

SCOTT: And what's their last names?

ALLISON: Um …

SCOTT: They all have the same last name?

ALLISON: No. I don't even know their last names.

SCOTT: Okay.

ALLISON: I don't even know …

SCOTT: You don't know any of their last names?

ALLISON: No.

SCOTT: Okay.

ALLISON: Tell my mom to bring them with her because they're with me till tomorrow.

SCOTT: Alright.

ALLISON: Thank you. (Scott leaves)

SCOTT: Do you have a phone number for their parents?

ALLISON: Can I have my phone please? I don't know their numbers by heart.

SCOTT: What's their … what's their mom and dad's name? Or who are you watching them for?

ALLISON: Their names are not in my phone as their name so can I please have my phone?

SCOTT: But what are … what are their names? That's what I'm asking?

ALLISON: I'm not … just … just … just …. my mom knows … just have my mom bring them up here with here. That's as much as I'm gonna say.

7

SCOTT:      Okay. I'm asking you because your mom doesn't … doesn't act like she wants to bring them up.

ALLISON:    Okay, well just … let me … can I call my mother please? I'm allowed … I'm entitled to a phone call, I know. So can I call my mother please?

SCOTT:      You'll be allowed to talk to your mom here in just a little bit. She's coming here.

ALLISON:    Okay but she needs to bring my kids and I need to let her know this.

SCOTT:      Okay.

ALLISON:    So can I please call her?

SCOTT:      Are they your kids?

ALLISON:    You have my phone right in your hand.

SCOTT:      They're talking to your mom right down there.

ALLISON:    Alright well can I go down there and speak with her please?

SCOTT:      On the phone. She's not here yet.

ALLISON:    Yes, I know. Can I go and speak with her please?

SCOTT:      As soon as she gets here, yeah. Okay? Just hang tight. (Scott leaves)

ALLISON:    You telling me I need to sit … oh you all is some assholes.

??????:     Who can come pick the kids up or ??????????? kids to pick them up?

ALLISON:    My … their mothers do not drive. That is why my mom has to bring them.

?????:      Where … where … they're not coming here, so where are they going?

ALLISON:    Can I put … I have to see if my neighbor can watch them, please. Because ….

?????:      Okay where do the parents to these kids live at?

ALLISON:    ??????????

??????:     Okay ???????????????

ALLISON:    Can you ask my neighbor to watch them just until I get home please? My neighbor was the one who went over there and sat with them till my mother got there. Huh? The one parent lives in ?????? where she's at. That's why I asked for my phone …

SCOTT:      What are their names?

ALLISON:    … that I can call them.

SCOTT:      What are their names? That's all I'm asking for.

ALLISON:    Even if I give you their names, their names is not in my phone as their real name.

SCOTT:      I'm asking you what are their names?

ALLISON:    Emari's mother's name is Erica.

SCOTT:      Erica what?

ALLISON:    I don't … If I don't know their last names what makes you think I know their mom's last name?

SCOTT:      Well I figure if somebody's gonna leave their kids with you ….

ALLISON:    No.

SCOTT:      …. you would at least know who they are.

ALLISON:    They're … Aariona and Aliyah's mother's name is Esha.

SCOTT:      Esha what?

ALLISON:    Can I speak to my mom?

SCOTT:      Your mom's not here yet.

ALLISON:    Can … can I speak to my mom?

SCOTT:      When she gets here, you'll get to speak with her.

ALLISON:    Alright you all ….

SCOTT:      Have a seat in there okay?

ALLISON:    I … I know I get a phone call.

SCOTT:      Have a seat in there please.

ALLISON:    So can I make a phone call please?

SCOTT:      Have a seat in there.

ALLISON:    Why ain't I entitled to a phone call yet?

SCOTT:      Because you're not entitled to one.  Have a seat.

ALLISON:    Can I get Tom?

??????:     Who?

ALLISON:    Where'd he go … Tom, yeah.

?????:      ????????????

ALLISON:    Yeah.

?????       You want a Detective?

ALLISON:    Yeah.

?????:      ???????? track him down.

ALLISON:    Cause he's the only one that's even nice right now, so I need to speak to him.

????:       Here he comes.

ALLISON:    It's nothing about the case.  I don't need … no, I just want you. Um …

BAXTER:     You want privacy!

ALLISON:    Yeah, just me and you cause you're the only one that is actually listening.  They all be here to try … trying to ?????????? 241-KIDS for my kids.  Um and I'm over here thinking um … since you're the only one that actually can talk like you got … I … I know I'm entitled to a phone call.  I've watched too many shows to know I'm entitled to a phone call.  But my kids' mothers' last names … Erica, her last name is Schmidt but my sons don't

9

have the same last name as them. Erica Schmidt. They get … they have …

BAXTER: How many … how many children do you have?

ALLISON: There's four kids at the house. Um … her last name is Schmidt and Esha's real name is not … it's "I" Esha but it's spelled like Esha. Um her last name is Esha Butler.

BAXTER: Can I get something to write … write with.

ALLISON: Because my … my kids can't afford to go to …

BAXTER: Hold on …

ALLISON: Yeah. Now I … I don't … I don't know how to spell Esha, cause like I said it's spelled … it's spelled a different way.

BAXTER: You have how many kids?

ALLISON: There's four of them in there. They wrote down their names. Uh Emir and …. Emir and Emari is Erica's sons.

BAXTER: How many … how many do you have?

ALLISON: They're not my blood kids. They're kids that I …

BAXTER: So we're trying to figure out who was at your house, is that right?

ALLISON: It was just me and my … and the four kids.

BAXTER: But they're not yours?

ALLISON: They're not my biological, no. They're with me for the weekend.

BAXTER: Oh okay.

ALLISON: Yeah.

BAXTER: So you think you know their first names?

ALLISON: No I know my kids' first names. I know their …

BAXTER: Know all the kids that …

ALLISON: I'm talking about their last names … their mothers last names is Erica, E-R-I-C-A, Schmidt.

BAXTER: How old is she?

ALLISON: She's 22. I don't … uh I don't know her number by heart though. That's why I was trying to get my phone so that I could call her because I knew at least you would at least let me do something. You the only one that actually is talking like you got some sense. They're just rude. That's why I don't like the police.

BAXTER: Hey I'm not gonna treat you bad, okay?

ALLISON: And that's why I … that's why I asked for you to come in here. I'd rather move to Indiana than stay here the way … the way you all act out there, I'd rather go out there. And then the other mother … there's two … there's two different mothers. That's … Erica has the two boys and then uh Esha Butler.

10

BAXTER:     I'm gonna take a stab at how you spell that.

ALLISON:    E-S-H-A …. yeah, H-A … Butler.  And those are the two girls.
            Make sure they don't call 241-KIDS, cause I can get them and
            get ahold of them and have my mom take them to them if I can
            …

BAXTER:     Do you know their phone numbers?

ALLISON:    It's in my phone.  I don't know them by heart.

BAXTER:     Okay.

ALLISON:    That's why I keep asking for my phone.

BAXTER:     Okay.

ALLISON:    Um that's why I … that's why I said have my mom bring them
            up here because then when she leaves she can take them to
            where they need to go.

BAXTER:     Okay.  I think they was gonna try to … I think your mom was
            gonna try to get up here.

ALLISON:    That's what I'm saying, but they're talking about my mom's not
            gonna bring my kids up here.

BAXTER:     Well she's not gonna leave them alone.

ALLISON:    Exact ...that's what I'm saying.  And then now they're talking
            about calling ?????????????.

BAXTER:     I don't know if that's gonna happen.  We'll … we'll … I'll
            make sure the kids are okay.

ALLISON:    At least I … I … I can trust you when you say that.  I don't … I
            … my kids is not … don't mess with my kids … just … even
            though they're not my biological kids, I … I treat them like they
            are, you know what I mean?

BAXTER:     You care about them.

ALLISON:    Of course.  I'll be on my … the two oldest ones they're 6 and
            ?????????????? the youngest boy, he was just born.  He was
            born … born four days before my birthday, so he's only 2
            months.  So them is my babies.  And my 2-year-old, she just
            turned 2 January 2nd.  So them is my babies.  I really wanna
            know what people's saying about me though.  That'd be …
            that'd be a good start.

BAXTER:     Are we gonna talk?

ALLISON:    I mean we can.  I wanna know what people's saying about me
            though.  Because like I told you, like I told the cop in the car
            when he said something about Indiana, I don't know nobody in
            Indiana.  I don't have a reason to go to Indiana.  I've never been
            to the casino.  I don't even know where the casino is.

BAXTER:     You're better off.

ALLISON: Yeah, I think I might be hitting the one up downtown though when it's done.

BAXTER: Stay away from it.

ALLISON: I want … I wanna go though. I watch gambling on TV ?????

BAXTER: I don't know if I'd do that if I were you.

ALLISON: I'm broke already. How much more debt can I get in?

BAXTER: Are you working right now?

ALLISON: Looking for a job. I got a job lined up. My cousin's girlfriend's sister works at a home healthcare place and she's suppose to be having her pull my app and so I can get started working. I'm trying. I just … I was working at Burger King but I quit Burger King because they was treating me like crap and I don't … I'm very head strong on being … how to be treated at a job. You know what I mean? Just because you're a higher authority …

BAXTER: I think … I think I can tell you're head strong. But I think somewhere in there is a nice person.

ALLISON: I'm too nice. That's what I'm always told.

BAXTER: I don't know that's a good quality to have … to be a nice person.

ALLISON: I don't think so. In … in the end you always get shitted on, you know? Like and it's … and it's mostly by family. That's why I don't really mess with my family too much. It's because those are the ones who really just kick you in the ass. Excuse my language.

BAXTER: You … you asked me a question a minute ago. And when … do you want me to answer that?

ALLISON: Yes.

BAXTER: Okay. Um I've been told that [D.H.] … do you know [D.H.]?

ALLISON: I know a [D]. ..

BAXTER: [D] …

ALLISON: That's my neighbor's nephew.

BAXTER: [D] and yourself, [S.N., B.N., and K.B.] um took a ride and wound up in Indiana. It might not have been your intention in the beginning, okay? And at someone else's direction, wound up way out in the middle of nowhere, okay?

ALLISON: Uh huh.

BAXTER: That's the best way to describe it, okay?

ALLISON: I'm listening cause …

BAXTER: Okay?

ALLISON: Okay, whatever.

BAXTER: And I want to be honest with you, I … I don't want to sit here and … and just put words in your mouth, I really don't. Um and

12

|          |                                                                                                                                                    |
|----------|----------------------------------------------------------------------------------------------------------------------------------------------------|
|          | I … I truly am here to be fair. I really am. And I told you when we first started talking, I'm gonna treat you with respect, okay?                   |
| ALLISON: | You have so far.                                                                                                                                    |
| BAXTER:  | Regardless, and you're gonna … you're gonna get that from me, you are.                                                                              |
| ALLISON: | You're the first cop that's ever said that.                                                                                                         |
| BAXTER:  | Well you are … you deserve it because you're human and I would want you to treat me that way.                                                       |
| ALLISON: | Some people don't care.                                                                                                                             |
| BAXTER:  | I would want you to show me respect as well.                                                                                                        |
| ALLISON: | Yeah.                                                                                                                                               |
| BAXTER:  | And that's one thing that you and I both can do here, is at least promise each other that we'll do that and …                                       |
| ALLISON: | That's why I asked for you to come in here.                                                                                                         |
| BAXTER:  | I think you know that … and I hope you can respect my occupation that I am a policeman and we take complaints and we ...                             |
| ALLISON: | As much as I don't like you guys, I … I … I can respect that. Because some … some of you all do your jobs … some of you all, can't say all of them. |
| BAXTER:  | Okay. And I'll … and … and that's fine. When … when we … did … what do you know about police work? Have you had any education in any of that kind of stuff? |
| ALLISON: | Well other than speeding tickets and like I watch TV shows about it.                                                                                |
| BAXTER:  | Let's forget about TV, cause there's so much of that is wrong.                                                                                      |
| ALLISON: | Well First 48, that's like … that's live ??????????                                                                                                 |
| BAXTER:  | Somewhat … somewhat. Well anyway, when we investigate things we take complaints, okay? Somebody rings up the phone and they make a complaint and we investigate it, okay? And a lot of what we do is we ask people questions about what happened, where were they, who were you with, where did you go, where did you stop, what did you touch, you know all this kind of stuff and … and evidence, we collect evidence. We try to corroborate, if you know what that word means. |
| ALLISON: | Uh huh.                                                                                                                                             |
| BAXTER:  | Verify.                                                                                                                                             |
| ALLISON: | Uh huh.                                                                                                                                             |
| BAXTER:  | Um what people say. But more than, just more than that, being truthful, one of the things that I have to do when I investigate things, I put everything on paper and then I present it to |

13

> somebody else and they are gonna want to know what kind of
> person you are, okay? Well I not only...
>
> ALLISON: That's why I wanted you to get it off of me.

Interview Tr. pp. 5-24.

Moore went on to make incriminating statements related to the Jackson robbery and the Hershman homicide. On January 7, 2013, the State charged Moore with felony murder, Class B felony burglary, and Class B felony conspiracy to commit burglary. On October 1, 2013, the State filed a request for a sentence of life without parole. On October 22, 2013, the State added a charge of intentional murder.

On March 26, 2014, Moore filed a motion to suppress her statement to police. On March 31, 2014, following a hearing, the trial court granted Moore's motion to suppress. The trial court certified the matter for interlocutory appeal, and, on June 3, 2014, this court accepted jurisdiction.

## DISCUSSION AND DECISION

### Whether the Trial Court Abused its Discretion in Granting Moore's Motion to Suppress

We review a trial court's decision to grant a motion to suppress as a matter of sufficiency. *State v. Moriarity*, 832 N.E.2d 555, 557-58 (Ind. Ct. App. 2005). When conducting such a review, we will not reweigh evidence or judge witness credibility. *Moriarity*, 832 N.E.2d at 558. In such cases, the State appeals from a negative judgment and must show that the trial court's ruling on the suppression motion was contrary to law. *State v. Estep*, 753 N.E.2d 22, 24-25 (Ind. Ct. App. 2001). This court will reverse a negative

14

judgment only when the evidence is without conflict and all reasonable inferences lead to a

conclusion opposite that of the trial court. *Id*. at 25.

> When one who is subject to custodial interrogation requests the assistance of counsel, all questioning must immediately cease and interrogation can be resumed only when the accused initiates a communication with police, and when it is apparent that he knowingly and intelligently waived his right to counsel. *Moore v. State*, 498 N.E.2d 1, 8 (Ind. 1986) (citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1044, 103 S. Ct. 2830, 77 L. Ed. 2d 405 (1983)). Things are different, however, when the suspect does not request counsel but instead only invokes his right to remain silent. *See United States ex rel. Riley v. Franzen*, 653 F.2d 1153, 1158 (7th Cir. 1981) (noting the difference between a suspect invoking the right to counsel and a suspect invoking the right to silence).
>
> In [*Miranda*], the United States Supreme Court wrote that "[o]nce warnings have been given the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." [384 U.S. at 473] (emphasis added). Although this provision could be read as prohibiting all further questioning of an individual who has indicated that he wishes to remain silent, the Court later clarified that this is not what was intended, stating:
>
> > Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent.
>
> *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). Instead, when a suspect has only invoked his right to remain silent:
>
> > there is not a per se rule prohibiting the authorities from ever initiating a discussion or further questioning the individual on the subject. Rather, it must be shown on a case by case basis that the authorities "scrupulously honored" the defendant's right to cut off questioning at any time, and that he knew and understood these rights and voluntarily waived them.
>
> *Id*. at 9; *see also Berghuis v. Thompkins*, — U.S. —, 130 S. Ct. 2250, 2273-74, 176 L. Ed. 2d 1098 (2010) (stating "the admissibility of statements obtained after the person in custody has decided to remain silent depends under

*Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored' ").

It is the State's burden to prove that the suspect's right to remain silent was scrupulously honored. *Jenkins v. State*, 627 N.E.2d 789, 796 (Ind. 1993); *Moore*, 498 N.E.2d at 10. There are several non-exclusive factors used to determine whether interrogation was properly resumed, including: the amount of time that lapsed between interrogations; the scope of the second interrogation; whether new *Miranda* warnings were given; and the degree to which police officers pursued further interrogation once the suspect has invoked his right to silence. *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004) (citing *United States v. Schwensow*, 151 F.3d 650, 658 (7th Cir. 1998); *Mosley*, 423 U.S. at 104-05, 96 S. Ct. 321).

*Mendoza-Vargas v. State*, 974 N.E.2d 590, 594-95 (Ind. Ct. App. 2012).

The State argues that the trial court erred in granting Moore's motion to suppress because (1) Moore was properly *Mirandized* and the interview stopped immediately when she invoked her right to silence, (2) additional questions put to Moore by Sergeant Scott were unrelated to the criminal investigation, and (3) Moore reinitiated the interrogation and impliedly waived her previously-invoked right to silence. Moore counters that (1) the State is requesting that we reweigh the evidence and revisit the trial court's findings; (2) the State's questioning of Moore did not, in fact, immediately cease; (3) Sergeant Scott's questioning of Moore led to the reintroduction of Detective Baxter; and (4) the police coerced Moore into making incriminating statements by their harassing questioning involving the children she was babysitting.

## A. Whether Questioning Immediately Stopped

The State argues that questioning immediately stopped once Moore invoked her right to silence, while Moore argues that the trial court found that it did not and that the State's

16

argument is therefore an invitation to reweigh the evidence.  The relevant portion of the

interview is as follows:

ALLISON: My thing is, like I told you, I don't have no reason to go to Indiana.  I don't know nobody in Indiana.  I can have my sister tell you I was with her.  If there's no evidence against me, I can't really say nothing because I wasn't in Indiana, so, with that being said, I'm done.

BAXTER: So you don't wanna talk to me anymore?

ALLISON: No, because this is just gonna go down the way that you guys are trying to make it go down.  Like I said, I don't know nobody in Indiana.  I was with my family last weekend.  And they can tell you that.

PATTON: Who … who were you with Allison?

ALLISON: I was with my sister.

PATTON: What's her name?

ALLISON: Neesha.  She's down in Georgia right now.

PATTON: She was in … were you in Georgia when you were ...

ALLISON: No, she just went down to Georgia on Wednesday.

PATTON: Is she a Moore?

ALLISON: No, she's a Robinson.  Her real name is Sharon but Neesha is her family name.

BAXTER: Okay, so are you telling me that we're not gonna talk?

ALLISON: That's what I'm saying.

BAXTER: Okay, well I guess I'll conclude this interview.  It was my hope that you would cooperate today.

ALLISON: I've … I've … I've told you what I know.  That's … I'm cooperating.

BAXTER: No, I don't think you're cooperating right now so I think I'm just gonna have to conclude this interview and we will rely on the others and we'll just have to see how this investigation goes.  So you're telling me that you don't want to talk to me right now?

ALLISON Uh huh.

BAXTER: Okay.  Well I'm just gonna leave you sitting in here for a few minutes okay?

ALLISON: Okay.

BAXTER: If you change your mind I will be out here.

ALLISON: ????????????  Thank you.

17

Interview Tr. pp. 7-9.

Detective Patton did not immediately stop his questioning of Moore, as he asked her who she was with the previous weekend and what her sister's name was after she unequivocally indicated she did not want to talk. Even though the questioning did not immediately result in incriminating statements, we conclude that the State did not scrupulously honor Moore's right to silence by immediately ceasing the questioning, as required by *Mosley*. This is particularly so because the questions related to a possible false alibi, which would have been incriminating. To the extent that the State argues that the interrogation immediately ceased upon Moore's invocation of her right to silence, this argument is an invitation to reweigh the evidence, which this court will not do.

### B. Sergeant Scott's Questioning

The State contends that Sergeant Scott's questioning about the children Moore was babysitting did not amount to interrogation and was therefore not improper. Moore counters that Sergeant Scott's questioning, although ostensibly about the children in Moore's care at the time of her arrest, was "harassing[,]" causing her to seek out Detective Baxter for relief, which led to resumption of the conversation regarding the criminal investigation.

### 1. Community-Caretaking Function

First, the State contends that Sergeant Scott's questions regarding the children were proper pursuant to the police's community-caretaking function. Moore argues that there is no indication that the children were in imminent danger, rendering the community-caretaking function inapplicable. Regarding the community-caretaking function, the Indiana Supreme

18

Court has stated,

> The police are expected not only to enforce the criminal laws but also to aid those in distress, abate hazards, prevent potential hazards from materializing, and perform an infinite variety of other tasks calculated to enhance and maintain the safety of communities. The Supreme Court has recognized this multifaceted nature of policing and, in *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S. Ct. 2523, 2528, 37 L. Ed. 2d 706 (1973) labeled it the "community caretaking function[]." This rubric is "a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities." [*U.S. v. Rodriguez-Morales*, 929 F.2d 780, 785 (1st Cir. 1991)].

*Fair v. State*, 627 N.E.2d 427, 431 (Ind. 1993).

The State notes that Moore had four children in her care, ranging from the ages of two months to six years, and police had no idea who the children's parents were, whether any had special needs, or whether Moore's mother was a viable care option. Moore notes that there is no indication in the record that the children were in imminent danger and that Moore's neighbor had taken over Moore's child care responsibilities until Moore's mother arrived. Moreover, Moore noted at oral argument that although she was arrested while caring for the children in her Ohio residence, both Sergeant Scott and Detective Baxter serve with the *Indiana* State Police.

There does not appear to be any Indiana authority on point.[3] However, given that the State has the burden to show that it scrupulously honored Moore's right to silence, the State has failed to show that the police's community-caretaking function justified continued questioning of Moore. While the State is correct that police had limited information

19

regarding the children in Moore's care, there is also no indication of any imminent peril.

Moreover, it is unclear what Indiana police officers would be able to do about children in

Ohio. The record in this case supports a conclusion that the State has failed to carry its

burden to show that Sergeant Scott's questions were justified pursuant to the community-

caretaking function.

### 2. Whether Sergeant Scott's Questioning Constituted Interrogation

The State also argues that because Sergeant Scott only asked questions related to the

children in Moore's care, his questioning did not amount to "interrogation." Moore argues

that Sergeant Scott's questioning of her was harassment that ultimately led her to seek out

Detective Baxter, to whom she ultimately confessed. "Under *Miranda*, 'interrogation'

includes express questioning and words or actions on the part of the police that the police

know are reasonably likely to elicit an incriminating response from the suspect." *White v.

State*, 772 N.E.2d 408, 412 (Ind. 2002) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301

(1980); *Loving v. State*, 647 N.E.2d 1123, 1126 (Ind. 1995)). "[C]ustodial interrogation for

purposes of *Miranda* includes both express questioning and words or actions that, given the

officer's knowledge of any special susceptibilities of the suspect, the officer knows or

reasonably should know are likely to 'have … the force of a question on the accused,'

*Harryman v. Estelle*, 616 F.2d 870, 874 ([5th Cir.] 1980), and therefore be reasonably likely

to elicit an incriminating response." *Penn. v. Muniz*, 110 S. Ct. 2638, 2650 (1990).

---

[3] Moore's Brief of Appellee, filed August 11, 2014, contains a citation to this court's opinion in *McIlquham v. State*, 992 N.E.2d 904 (Ind. Ct. App. 2013), which was vacated by order of the Indiana Supreme Court nearly seven months previously, on January 16, 2014.

Examination of the record reveals that neither Sergeant Scott nor Detective Baxter asked Moore anything about the crimes being investigated until after she expressed some interest in the criminal investigation. The question, then, is whether Sergeant Scott and/or Detective Baxter knew or reasonably should have known that questioning Moore about the children was reasonably likely to elicit an incriminating response. Moore argues that Sergeant Scott's questioning was intentionally antagonistic such that Moore was coerced into asking for Detective Baxter, who had been "nice" to her, whereupon she confessed.

The trial court found that Sergeant Scott's questioning of Moore amounted to continued interrogation, and, because the questioning did not overtly concern the criminal investigation, can only mean that the trial court found that Sergeant Scott's and Detective Baxter's ostensibly unrelated questioning was intended to ultimately elicit an incriminating response. Under the circumstances, we cannot conclude that this finding is clearly erroneous. As can be seen from the transcript of the interview, Sergeant Scott's conversation with Moore became increasingly contentious, until, at last, she called for Detective Baxter's return. Soon after Detective Baxter returned, Moore indicated that he was the only police officer who had been "nice" to her and soon thereafter indicated that she wished to know what others were saying about her. Especially when one considers that neither Sergeant Scott nor Detective Baxter had any apparent authority to actually do anything about the children who had been in Moore's care, it seems likely that their continued questioning of Moore was intended to eventually induce her to make incriminating statements. We conclude that Sergeant Scott's and Detective Baxter's questioning of Moore amounted to

21

interrogation, which was pursued despite Moore's clear invocation of her right to silence.

Because the State did not scrupulously honor Moore's right to silence in this case, the trial

court did not err in granting her motion to suppress her incriminating statements.[4]

We affirm the judgment of the trial court.

RILEY, J., and ROBB, J., concur.

---

[4] Because we conclude that the State's questioning regarding the children amounted to interrogation, we reject the State's argument that Moore reinitiated the interrogation.