## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 13 2020, 9:45 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Fredrick Lee Ford, Jr.,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff*

November 13, 2020

Court of Appeals Case No.
19A-CR-2588

Appeal from the Marion Superior Court

The Honorable Shatrese Flowers, Judge

Trial Court Cause No.
49G02-1802-MR-4613

**May, Judge.**

[1] Fredrick Lee Ford, Jr., appeals following his conviction of murder.[1] He raises two issues on appeal, which we revise and restate as: (1) whether the trial court committed reversible error when it admitted into evidence portions of Ford's recorded police interrogation, and (2) whether the trial court's written order erroneously ordered Ford to pay a $100 supplemental public defender fee. We affirm Ford's conviction and remand for correction of the court's clerical error.

## Facts and Procedural History

[2] Ford and Catrina Russell began dating in August 2017, and Ford moved into Russell's apartment shortly thereafter. In January 2018, Russell went on a cruise with an older male friend, Ronnie Rudolph, and Rudolph's adult daughter. Ford began to suspect that Russell and Rudolph were romantically involved. On Friday, January 26, 2018, Dontoria Gilbert, Russell's adult daughter, visited Russell at Russell's apartment, and Ford called Russell while Gilbert was visiting. Gilbert heard Ford "hollering" at Russell over the telephone, and Russell asked Gilbert to get on the phone to assure Ford that Russell was not lying to him about where she was. (Tr. Vol. II at 153.) Later that day, Russell told Ford that he needed to find a new place to live.

[3] Around 3:00 pm on Sunday, January 28, 2018, customers at the New York Express convenience store located at the corner of Rural Street and New York

---

[1] Ind. Code § 35-42-1-1.

Street in Indianapolis observed a dark Lexus sedan, later identified as Russell's vehicle, pull into the parking lot. Aranda Rodriguez, Silvia Martinez, and their children were at the New York Express and observed an African American couple arguing in the Lexus. The female was in the driver's seat and the male was in the passenger seat. Rodriguez and Martinez then heard a gunshot. They saw the woman's body, later identified as Russell, get pushed out of the vehicle. The Lexus backed over the woman's body, went forward again over her body, and then left the convenience store parking lot. A camera installed by the City of Indianapolis at the intersection of Rural Street and 10th Street captured the Lexus travelling north on Rural Street. Martinez took pictures of the car and its license plate with her phone and called 911. Russell had a gunshot wound to her head and died at the scene.

[4] Sometime between 3:00 pm and 5:00 pm that same day, Ford visited his friend Reginald Batts at Batts' house in the 1600 block of Gladstone Avenue. Batts did not expect a visit from Ford that afternoon. Ford told Batts that his car stopped running and "he spilt a bunch of Ketchup on him in the car." (*Id.* at 242.) Ford talked about how Russell "was probably playing around on him" and called her a "gold digger or something." (*Id.*) Ford used Batts' bathroom to try to wash the stains off his pants. Ford then used Batts' phone to call for a ride and left Batts' house. Ford did not return to the apartment he shared with Russell to collect his possessions after Russell's death. Ford also did not answer phone calls from Russell's father after Russell died, even though Ford had talked regularly with Russell's father when Russell was alive.

[5]     Roughly a mile from the New York Express and near Batts' residence, Indianapolis Metropolitan Police Department ("IMPD") officers found Russell's vehicle running, with significant blood staining inside the vehicle. Marion County Crime Lab analysis found most of the blood matched Russell's DNA profile. Officers found Russell's cell phone inside the vehicle, and near the vehicle, officers found Russell's purse, a black leather jacket, a black stocking cap, and Russell's 357 magnum revolver. The revolver contained one fired cartridge and four unfired cartridges. Crime Lab analysis revealed DNA found on the gun belonged to Russell and an unidentified male.

[6]     Detective Harry Dunn met with Gilbert and Gilbert's father after Russell's death, and then he attempted to contact Ford. Ford did not return Detective Dunn's phone calls, but he did come for an interview at the IMPD homicide office on February 2, 2018. At the beginning of the interview, Detective Dunn read Ford his *Miranda* rights,[2] and Ford signed a form waiving those rights. Ford told Detective Dunn that on the day of Russell's death, Ford got off work and returned to the apartment he shared with Russell. Ford and Russell left the apartment to grab something to eat. Russell drove with Ford in the passenger seat. According to Ford's account, near the intersection of 35th Street and Keystone Avenue, Russell told Ford "to get out, [she] didn't like [Ford's] attitude and this and that[.]" (Ex. 113 at 7:39 to 7:41; Ex. 113A at 3.) Ford told Detective Dunn that he left his phone, keys, and debit card in the vehicle,

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966), *reh'g denied*.

but he exited the car and flagged down a stranger. The stranger then drove Ford to an area near Ford's sister's house. Ford said he then ran into his nephew and his nephew gave him some clothes. Ford's nephew and some of his nephew's friends then drove Ford to a hotel and paid for his room. When Detective Dunn asked Ford questions about the hotel, Ford gave only a general location. He could not name the hotel, nor could he say when he arrived at the hotel. Detective Dunn asked Ford additional questions, including why Ford did not contact law enforcement after finding out about Russell's death:

> [Det. Dunn:] Okay. And so, uh; now, I, okay. So, and that's pretty much . . . and so, and the reason why you didn't call was what?
>
> [Ford:] Man, I was you know, uh; s[***], surprised, after that happened. I didn't know what to do. I'm just have to get my thoughts together. 'Cause I know they're going to be asking me stuff and, you know, like I said, I was blown away. And I was grieving. I'm done.
>
> [Ford brushes his hand across his neck in a slashing motion]
>
> [Det. Dunn:] You was blown away and you was grieving. You talk to Terry? Have you talked to your family at all?
>
> [Ford:] (No response.)
>
> [Det. Dunn:] You even call Terry?
>
> [Ford:] My nephew and them.

[Det. Dunn:] So, they called and they were (inaudible) for you? 'Cause your family was worried about where you was at as well, man.

[Ford:] Uh, I met my nephew and them, uh; a day or so. And that was it. I'm alright.

[Det. Dunn:] Alright. They uh; and so, and then what made you reach out, uh; last night?

[Ford:] I'm ready to talk. And I'm done.

[Det. Dunn:] So, you were just ready to come in 'cause you had time to kind of just digest, and, and deal with your week? And don't let me put any words in your mouth. I'm just, uh, I think that's what I'm getting from what you're saying, right?

[Ford:] (Nonverbal response)

[Det. Dunn:] You got to say out with . . . stay with me here. You got to say it out loud for me.

[Ford:] Listen, listen . . .

[Ford extends his right hand with his palm open]

[Det. Dunn:] 'Cause, let me, let me tell you another thing real quick.

[Ford:] Let, let, let me say, let me tell you.

[Det. Dunn stands up and grabs his keys off of the table]

[Det. Dunn:] Before I, I walk out of the room I'm just going to say it like this, okay.  Is there any reason why your DNA would be on the gun?[3]

[Ford:] Huh?

[Det. Dunn:]  Is there any reason why your DNA would be on that gun?

[Ford:] No.

[Det. Dunn:] None whatsoever?

[Ford:] Not that I know of.

[Det. Dunn:] And you didn't know that it was there until she had the incident with Ronnie, is that right?

[Ford:] (Nonverbal response) [Ford nods]

[Det. Dunn:] You got to say it out loud, man.

[Ford:] Yep.

(Ex. 113 at 16:42 to 18:24; Ex. 113A at 9-10.)

---

[3] At trial, Detective Dunn admitted that he did not know if Ford's DNA was on the murder weapon at the time he made this statement to Ford.

Detective Dunn then continued to ask Ford questions, including questions about whether Ford's DNA would be on various items Russell owned.

> [Det. Dunn:] Okay. And so, I understand the time that you've taken to digest this. Okay. But it's totally different when you also identified . . .
>
> [Ford raises his right hand with his palm open, facing Det. Dunn]
>
> [Ford:] Big man, Big man . . .
>
> [Det. Dunn:] . . . as being . . . just . . .
>
> [Ford:] Big man.
>
> [Det. Dunn:] It's Detective Dunn, sir.
>
> [Ford:] Oh.
>
> [Det. Dunn:] I respect how I talk to you.
>
> [Ford:] Okay. Deduct-,
>
> [Det. Dunn:] Please do the same.
>
> [Ford:] Detective Dunn . . . I'm done, man.
>
> [Det. Dunn:] Huh?
>
> [Ford:] I'm done. I'm done. I said what I said and I'm done.

[Ford waives his hand with his palm open]

[Det. Dunn:] What are you done for? We just got started.

[Ford:] I'm done. I'm done. I spoke. I said what I said and that's that. And that's what happened.

[Det. Dunn:] Okay. So, are you going to explain to me why literally you gave me the statement that you gave a-, with me understanding the information and the . . .

[Ford:] Yeah, but I'm just saying . . .

[Det. Dunn:] . . . the evidence that I have. I mean . . .

[Ford:] . . . I'm down here.

[Det. Dunn:] I, I but you know the totally contradicts with what . . .

[Ford:] Listen, listen, listen, listen . . .

[Det. Dunn:] . . . you just said to me.

[Ford:] Listen. Listen to what I'm saying. I came down here to talk to you, you know. Ain't had nothing to hide. Now, I'm done.

[Det. Dunn:] Okay. But you . . .

[Ford:] I'm done.

[Det. Dunn:] You do hear me.  I'm going to make sure that you understand what I just said, right?

[Ford:] Yes, sir.  Yeah.

[Det. Dunn:] Okay.  And so, your DNA ain't supposed to be on the gun?

[Ford:] No.

[Det. Dunn:] Well, we have an issue there.  And then you're on tape, the place that you pulled into the gas station while she's driving.

[Ford:] (Inaudible)

[Det. Dunn:] You pushed her out of the car.

[Ford:] Okay.  Alright.  I'm not saying . . .

[Det. Dunn:] And then you actually ran over her, man!

[Ford:]  I'm not, I'm not . . .

[Det. Dunn:] I think you was . . . (inaudible) just ask me to give you a break.

[Ford:] Hey . . .

[Det. Dunn:] . . . when you backed up and was . . .

[Ford:] Hey, man, I'm not saying none of that! That's what you're saying!

[Det. Dunn:] Oh. Well, I agree. I'm saying that.

[Ford:] Yeah.

[Det. Dunn:] Right.

[Ford:] Okay, then I'm done.

[Det. Dunn:] I'm clear on that part. You, you . . . let me also make it more clear you ain't admitting to, let's just make it clear, right. You're not . . .

[Ford:] Right.

[Det. Dunn:] . . . admitting to this being you on . . .

[Ford:] I'm not guilty.

(Ex. 113 at 20:39 to 22:09; Ex. 113A at 12-14.) Ford denied shooting Russell or being responsible for her death, and Detective Dunn continued to question Ford about the details of his story. Detective Dunn questioned Ford about where Russell told him to get out of the car, and Ford had trouble identifying where she let him out. When Ford had trouble identifying where Russell let him out of the car, Detective Dunn urged Ford to "help me fight for [C]atrina." (Ex. 113A at 20.)

Officers arrested Ford after the interrogation, and the State charged him with Russell's murder.[4] The trial court held a three-day jury trial beginning on September 23, 2019. The jury found Ford guilty, and the trial court imposed an executed sixty-four-year sentence in the Indiana Department of Correction.

# Discussion and Decision

## I. Recorded Interrogation

### *A. Detective Dunn's Interrogation of Ford*

Before trial, Ford filed a motion to suppress the videotape of Detective Dunn's interrogation of Ford, and he objected at trial to the admission of the video into evidence. Specifically, Ford argued the portions of the interrogation after he said "I'm done, man" were inadmissible. (App. Vol. II at 240-241.) Because Ford appeals following his conviction of murder, we look at whether the trial court erred in admitting the challenged portions of the recorded interrogation into evidence. *Strickland v. State*, 119 N.E.3d 140, 146 (Ind. Ct. App. 2019), *trans. denied*. "A trial court has broad discretion in ruling on the admissibility of evidence, and we will reverse the trial court's ruling only when the trial court abuses that discretion." *Scanland v. State*, 139 N.E.3d 237, 242 (Ind. Ct. App. 2019). An abuse of discretion occurs if the trial court's decision is against the facts and circumstances before it or if the court misinterprets the law. *Id*.

---

[4] The State also charged Ford with Level 3 felony armed robbery pursuant to Indiana Code section 35-42-5-1, but the State dismissed the armed robbery charge prior to trial.

When reviewing the admissibility of evidence, "we do not reweigh the evidence, and we consider conflicting evidence in a light most favorable to the trial court's ruling, but we also consider any undisputed evidence that is favorable to the defendant." *Harrison v. State*, 32 N.E.3d 240, 250 (Ind. Ct. App. 2015), *trans. denied*. However, when "we consider matters of law, including constitutional questions, our review is de novo." *State v. Glaze*, 146 N.E.3d 1086, 1091 (Ind. Ct. App. 2020), *trans. denied*.

[10] *Miranda* bars prosecutors from using statements a person gives police during a custodial interrogation unless the person is first warned "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966), *reh'g denied*. The United States Supreme Court went on to explain that

> If the individual indicates in any manner, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

*Id*. at 473-74.

[11] The subject of an interrogation must clearly and unequivocally invoke his right to remain silent. *Wilkes v. State*, 917 N.E.2d 675, 682 (Ind. 2009), *reh'g denied*, *cert. denied*, 562 U.S. 981 (2010). The police must then scrupulously honor the suspect's right to remain silent and cease questioning the suspect. *Moore v.*

*State*, 498 N.E.2d 1, 9 (Ind. 1986). In *Mendoza-Vargas v. State*, we noted that a suspect shaking his head in response to being asked if he wanted to answer questions "was an obvious invocation of his right to remain silent." 974 N.E.2d 590, 595 (Ind. Ct. App. 2012). We therefore held the police did not scrupulously honor the suspect's right to remain silent when they continued to question him. *Id*. at 596. Similarly, in *State v. Moore*, we held police officers did not scrupulously honor a suspect's right to remain silent when they continued to question her after she said "I'm done" and answered no when asked if she wanted to continue talking. 23 N.E.3d 840, 852 (Ind. Ct. App. 2014), *trans. denied*. We also held that a suspect's statement that he was "done with answering questions right now" was an unequivocal invocation of his right to remain silent. *State v. Battering*, 85 N.E.3d 605, 608 (Ind. Ct. App. 2017), *reh'g denied*.

[12] Ford asserts he clearly and unequivocally invoked his right to remain silent, and Detective Dunn failed to scrupulously honor his right. We agree. Ford indicated that he wished to stop talking by saying "I'm done" multiple times throughout the interrogation, trying to get Detective Dunn's attention, and saying, "I said what I said and I'm done." (Ex. 113A at 10-14.) Ford even used hand gestures, such was waiving his hand across his neck in a slashing manner and raising his right hand with an open palm towards Detective Dunn. (Ex. 113.) Rather than ending the interview, Detective Dunn continued to ask Ford questions and even said, "What are you done for? We just got started." (Ex. 113A at 13.)

[13] The State argues that when Ford said "I'm done," he "was communicating that his story was done and that he did not have answers to the detective's questions; that is not the same as invoking silence and ending the interview." (Appellee's Br. at 16.) However, as Ford notes in his reply brief, "the detective's words and actions during the interrogation compel the conclusion that Detective Dunn was aware Ford did not want to answer more questions." (Appellant's Reply Br. at 4.) For example, after Ford said he was done, Detective Dunn got up from the table, grabbed his keys, and stood by the door to the interrogation room. Detective Dunn even prefaced his next question by saying, "Before I, I walk out of the room . . . ." (Ex. 113A at 10.) Detective Dunn was required to immediately cease the interview when Ford invoked his right to remain silent, but instead, Detective Dunn continued to badger Ford with questions. Therefore, we hold the trial court erred in admitting into evidence the portions of the interrogation that occurred after Ford indicated he was done with the interview. *See Risinger v. State*, 137 N.E.3d 292, 299-300 (Ind. Ct. App. 2019) (holding trial court abused its discretion by admitting statements defendant made after he unequivocally invoked his right to remain silent), *trans. denied*.

### B. Harmless Error

[14] Nonetheless, we still must determine whether the erroneous admission of portions of Ford's interrogation amounts to anything more than harmless error. *Morales v. State*, 749 N.E.2d 1260, 1267 (Ind. Ct. App. 2001). "The improper admission of evidence is harmless error when the conviction is supported by

substantial independent evidence of guilt which satisfies the reviewing court that there is no substantial likelihood the challenged evidence contributed to the conviction." *Id.* When the error implicates a federal constitutional right, we review the error de novo and must be satisfied that the error was harmless beyond a reasonable doubt. *Crabtree v. State*, 152 N.E.3d 687, 703 (Ind. Ct. App. 2020).

[15] Ford argues that admission of the portion of the interrogation video after he invoked his right to remain silent amounts to reversible error. He contends the erroneously admitted portions of the examination substantially affected his substantial rights because Detective Dunn's questioning after Ford invoked his right to remain silent "focused the jury's attention on potential inconsistencies in his statement and on his perceived unwillingness to help Dunn 'fight for Catrina.'" (Appellant's Br. at 28.) Ford also notes that the State referenced Detective Dunn's "fight for Catrina" statement during the interrogation in the State's closing argument. (*Id.*) However, properly admitted evidence overwhelmingly points to Ford's guilt.

[16] Ford and Russell had an acrimonious romantic relationship. Witnesses testified Russell and an African American man argued with each other in Russell's car in a convenience store parking lot. Russell was shot in the head and left in the parking lot. Ford made an unannounced visit to Batt's house around the time of the shooting and complained about spilling ketchup on himself and all over his car. Russell's car was found near where the shooting occurred and a short distance from Batt's house. Russell's car was stained with her blood and a gun

with a fired cartridge was recovered near her vehicle. Also, before Ford invoked his right to remain silent, he admitted to being in Russell's car with Russell near the time of the shooting, and Ford could not identify the hotel where he claimed to have stayed the night of the shooting. Therefore, overwhelming independent evidence existed to support the jury's guilty verdict. While Ford's statements after invoking his right to remain silent should not have been admitted, we hold such error was harmless. *Wright v. State*, 766 N.E.2d 1223, 1232 (Ind. Ct. App. 2002) (holding erroneous admission of statements police obtained in violation of *Miranda* was harmless error because sufficient independent evidence supported conviction).

## II. Public Defender Fee

[17]  When imposing sentence, the court explained, "Due to the Defendant's length of incarceration, the Court is finding the Defendant indigent to a fine, indigent to a court cost, and indigent to a public defender fee." (Tr. Vol. IV at 44.) However, the order following Ford's initial hearing and the sentencing order assess a $100 public defender fee. (App. Vol. II at 32; 84.) Ford argues assessment of the public defender fee in the sentencing order was a clerical error and asks us to remand the case for correction of the clerical error. The State likewise asks us to "remand for clarification of the trial court's intent to impose the $100 supplemental public defender fee." (Appellee's Br. at 22.)

[18]  When a trial court's oral pronouncement and its written sentencing order differ, "we examine them together to discern the intent of the sentencing court." *Walker v. State*, 932 N.E.2d 733, 738 (Ind. Ct. App. 2010), *reh'g denied*. The trial

court indicated it was not imposing fees because of the length of Ford's sentence. Ford was in his fifties at the time of sentencing and likely will pass away before completing his sentence. Therefore, we find the trial court unambiguously intended not to impose the $100 public defender fee, and we remand for correction of the sentencing order. *See id.* at 739 (remanding for correction of the Amended Judgment and Chronological Case Summary given the unambiguous nature of the trial court's pronouncement).

# Conclusion

[19] The trial court erred in admitting the portions of Ford's interview that occurred after Ford invoked his right to remain silent by saying "I'm done" and using hand gestures. Nonetheless, such error was harmless because overwhelming independent evidence supported the jury's guilty verdict. We therefore affirm Ford's conviction. However, we remand the case for correction of the sentencing order to indicate Ford is not required to pay a supplemental public defender fee.

[20] Affirmed and remanded.

Riley, J., and Altice, J., concur.